UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER L. WALTERS, | Case No. 19-cv-00702-DMR |
| Plaintiff, | |
| v. | **ORDER ON MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| COUNTY OF CONTRA COSTA, et al., | Re: Dkt. No. 33 |
| Defendants. | |

Defendants Contra Costa County ("the County"), Brian Cain, Felicia I. Tornabene, and Angela Prasad move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff Walter L. Walters's second amended complaint ("SAC"). [Docket No. 33.] The court held a hearing on September 26, 2019. For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

Plaintiff makes the following allegations in the SAC, all of which are taken as true for purposes of this motion.[1] Plaintiff, who is African American, is a licensed physician practicing in the field of anesthesiology. [Docket No. 28 (SAC) ¶¶ 1, 11.] In 2017, he contracted with a temporary staffing agency for placement at health care facilities needing temporary physicians. In October 2017, the agency assigned Plaintiff to work at Contra Costa Regional Medical Center ("CCRMC" or "the hospital"), a public hospital owned and operated by the County. Plaintiff notified the agency that he would accept the assignment on the condition that he work only eight-hour shifts, Monday through Friday, from 7:00 am to 3:00 pm. Plaintiff had recently suffered an

---

[1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

illness causing him to lose 30 pounds in one month, and did not want to work long, exhausting shifts while trying to learn the cause of his illness. The agency agreed "and replied it would inform he hospital to schedule his shifts accordingly." *Id*. at ¶¶ 5, 11.

Plaintiff began orientation and training at CCRMC on October 31, 2017. His first two scheduled shifts were for 12 hours, contrary to his agreement with his agency. Plaintiff alleges that he complained to Defendant Felicia I. Tornabene, the hospital's medical director, telling her "of his prior request to the agency to work only 8-hour shifts because of his extreme weight loss and exhaustion during longer shifts." He informed Tornabene that he suffers from inflammatory bowel disease ("IBD"), and told her that due to psoriasis on his leg and "a painful ankle due to surgery" he "had some difficulty walking, particularly if he had to walk or stand during long shifts." *Id*. at ¶ 12. "Plaintiff explained that working long shifts weakened him and caused him pain." He alleges that Tornabene "acknowledged [his] concerns, apologized, and informed him she would look into the matter." *Id*. Plaintiff later learned that the anesthesia department did not have 7:00 a.m. to 3:00 p.m. shifts; it had only 10.5-hour, 12-hour, and 24-hour shifts. *Id*. at ¶ 13.

During the following weeks, Plaintiff's IBD improved to the extent that he was able to work longer shifts, and he alleges he "provided competent care to hospital patients without incident or complaints during the entire term of his assignment." However, despite his conversation with Tornabene, Plaintiff learned that he was scheduled to work a 24-hour shift on December 28, 2017 and a 12-hour shift on December 29, 2017, which was the last day of his contract. Plaintiff complained to two doctors at the hospital but his schedule did not change. Plaintiff worked the 24-hour shift on December 28, 2017 and appeared for his final shift on December 29, 2017 "out of a sense of duty because the hospital needed anesthesia coverage on that day." *Id*. at ¶¶ 13-15.

During breaks in between cases on his December 29 shift, Plaintiff "retired to his private call room where he would rest or sleep." After performing one procedure, a nurse told Plaintiff that "a patient said his eyes were red" and informed him that "his speech sounded slurred." *Id*. at ¶ 15. He did not respond "because he was tired and did not believe it was necessary to explain his private medical conditions," including the fact that he wears a partial denture that can affect his

1  speech. *Id*. at ¶¶ 15, 23.

2       Later that day, while Plaintiff was taking a break, he heard a knock on the door to his

3  private room. When he opened it, Tornabene and two nurses were waiting. One nurse asked, "Do

4  you know who I am?" to which Plaintiff responded yes. Another "asked if he was feeling okay,"

5  and Plaintiff answered yes. After they left, Plaintiff went back to sleep. *Id*. at ¶ 16.

6       Plaintiff alleges that Tornabene then "made a determination that plaintiff was under the

7  influence of either drugs or alcohol even though she did not physically examine [him] or give him

8  a blood test." *Id*. at ¶ 17. Tornabene contacted the County Sheriff's Department "to provide

9  security to remove plaintiff from the hospital." When Deputy Sheriff Brian Cain arrived,

10  Tornabene told Cain "that although she believed plaintiff was under the influence of drugs or

11  alcohol, she did not want him to arrest or prosecute plaintiff," and that "instead of arresting

12  plaintiff, [Cain] should escort him out of the hospital and put him in a taxi," and that Plaintiff

13  "should not be permitted to drive himself home." *Id*. "Tornabene told Cain she also desired his

14  presence as security if plaintiff became 'confrontational' when she told him he was being

15  removed." *Id*.

16       Cain requested assistance, and then-Sergeant Angela D. Prasad (now Lieutenant) arrived as

17  Cain's supervisor. Cain and Prasad "agreed with Tornabene that they would follow her directions

18  in handling this matter." *Id*. at ¶ 18. Cain knocked on Plaintiff's door, waking him. When

19  Plaintiff opened the door he saw only Cain in his uniform. Cain closed the door slightly so that

20  only Cain and Plaintiff could see each other, and "[i]n a firm tone of voice" said "'come out here'

21  because he wished to speak with [Plaintiff]." *Id*. at ¶ 19. As Plaintiff was tired "and had been

22  sleeping partially undressed," he "asked Cain to enter the room and talk there while he got

23  dressed." Cain said, "'[n]o, you come out' because Tornabene wished to speak with" Plaintiff.

24  Plaintiff then closed the door and started to dress. *Id*. After a few minutes, Cain became impatient

25  and pounded his fist on the door, yelling "with an angry tone of voice . . . 'Come on, let's go!'"

26  *Id*. at ¶ 20. Plaintiff, who was "fearful of any potential encounters with law enforcement" and did

27  not want to give Cain "any reason to suspect he was disobeying his command, being

28  uncooperative, or hiding something," immediately complied and opened the door, even though he

3

was still getting dressed.  *Id*.

When Plaintiff exited the room, he saw Cain, Prasad, Tornabene, at least one nurse, and a person who appeared to be a private security guard.  Tornabene told Plaintiff that "his services were no longer needed and another physician was assigned to finish his shift.  She also told plaintiff he would not be allowed to drive himself home," and "said the deputies would put him in a taxi and she would give him a prepaid voucher to pay the driver."  *Id*. at ¶ 21.  At some point during this encounter Plaintiff "realized he was suspected of being under the influence of drugs" and "stated he did not use drugs."  *Id*. at ¶ 22.  He also asked why his services were being terminated.  "Tornabene stated he did not appear as if he could work," and "stated that his speech appeared to be slurred."  *Id*. at ¶ 23.  Plaintiff explained that he has a partial denture to replace some of his upper teeth, and that he uses his tongue to keep it in place when he is resting or sleeping.  He explained that in those situations, his speech appears to be slurred, and he took out his partial denture to show it to Tornabene and the others.  *Id*.

Tornabene also stated that Plaintiff "appeared to have difficulty walking."  He then "pulled up his pant leg and revealed the psoriasis on his right leg" and the "surgery scar on his right ankle."  *Id*. at ¶ 24.  Plaintiff "explained that he had screws surgically installed in his ankle to repair a fracture and that the pain caused him to limp when he was required to stand or walk for long periods."  *Id*.  Despite Plaintiff's explanations, "Tornabene stated plaintiff still had to leave and take a taxi."  *Id*.  In response, Plaintiff stated that he did not want to take a taxi and would drive himself home.  "One of the deputies told plaintiff they would not permit him to drive home," and that Plaintiff "would be escorted out of the hospital and put into a taxi pursuant to Tornabene's request."  *Id*. at ¶ 25.

Plaintiff continued to "proclaim his innocence," to no avail.  He then asked Tornabene to give him a drug test in the hospital's laboratory, pursuant to the hospital's "protocol requiring the testing for substance abuse of any physician who is suspected of being under the influence while on duty."  Tornabene refused.  *Id*. at ¶ 26.  Plaintiff then asked the deputies to give him a drug, alcohol, or sobriety test, which they refused.  *Id*. at ¶ 27.  Neither deputy performed any investigation, such as asking Plaintiff if he had consumed any alcohol or drugs, examining his

4

eyes, attempting to smell his breath, or search Plaintiff's person, property, or room for drugs or alcohol. Defendants Cain and Prasad "had a duty to conduct an adequate investigation and establish independent probable cause because plaintiff gave plausible explanations for his perceived behavior and he demanded a drug test multiple times," but instead "impermissibly substituted Tornabene's judgment for their own." *Id.*

Accompanied by Cain, Plaintiff went to the locker room to get dressed. He packed his luggage in front of Cain and displayed to him the contents, which did not include any contraband. He also showed Cain his swollen hands and explained that he had rheumatoid arthritis. *Id.* at ¶ 28.

Plaintiff was unable to find his car keys or his cell phone and returned to his room to search for them. He alleges that Prasad, who had been "rushing Cain and plaintiff to leave because she had 'somewhere to go,'" became "irritated and more forceful," rushing Plaintiff. *Id.* at ¶ 29. After being escorted to the lobby with Cain and the guard, Plaintiff and Cain exited the building to search Plaintiff's vehicle for his car keys. The guard remained in the lobby with his luggage and Prasad remained in the building. *Id.* at ¶ 32.

Plaintiff and Cain searched Plaintiff's car for the keys without success. Plaintiff then "informed Cain he was going to sit in the driver's seat and press the ignition button to see if the keys were in the vehicle. If the vehicle started, the keys were somewhere inside the vehicle." *Id.* at ¶ 33. According to Plaintiff, "Cain said nothing and walked to the driver's side" of the car next to Plaintiff, who was sitting in the driver's seat. Plaintiff pushed the ignition button and the vehicle started. "Cain suddenly lunged at plaintiff, twisting his hand and wrist into a martial arts submission hold." Cain then "dragged plaintiff out of the vehicle by his hand and wrist and forced his arm behind his back." *Id.* Plaintiff, who suffered "extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder . . . screamed in pain and yelled 'What are you doing?!!'" *Id.* at ¶ 34. Cain replied that Plaintiff "was trying to get away and that his keys were in his pocket." Plaintiff replied that they were not, and Cain instructed Plaintiff to move away from the car. Plaintiff complied, and Cain sat in the driver's seat and started the car. He then found Plaintiff's keys underneath the car seat. *Id.* Plaintiff and Cain then returned to the hospital lobby, and Prasad gave Plaintiff his cell phone. Plaintiff traveled to his hotel by taxi. He later returned to

the hospital and retrieved his car without incident. *Id*. at ¶ 34.

Plaintiff took a substance abuse panel drug test on January 25, 2018, which tested for signs of drug use for the previous 90 days. The test results were negative. *Id*. at ¶ 35.

He later learned that "certain physicians and nurses in the hospital's anesthesia department harbored racial animus towards him as an African American." *Id*. at ¶ 36. Another doctor informed Plaintiff that Dr. Jeffrey Saadi, the Chief of Anesthesia, and hospital nurses used a racial slur to refer to Plaintiff. *Id*. Plaintiff alleges that "Tornabene, in conjunction with Saadi and some nurses, conspired to set up plaintiff to be terminated at the end of his shift," and that Tornabene "retaliated against plaintiff for complaining about his assigned shifts and because she and others in the hospital harbored racial animus against him as an African American." *Id*. at ¶ 37. He further alleges that Tornabene caused Plaintiff to be assigned the 36-hour shift on his final two days despite his complaints, knowing that "such a demanding shift would weaken him and make it appear as if he was under the influence of drugs or alcohol, especially in light of his medical conditions which she had knowledge of." *Id*. She "intentionally gave Cain and the deputies false and misleading information regarding plaintiff's sobriety," even though she knew the reasons for his slurred speech and difficulty walking. *Id*. Following the incident, Tornabene prepared the hospital's report of Plaintiff to the state medical board for physician misconduct but made no mention of drugs or alcohol. *Id*. at ¶ 41.

The amended complaint alleges the following five claims for relief: 1) a 42 U.S.C. § 1983 claim for violation of the Fourth Amendment against Cain, Prasad, and Tornabene based on Cain and Prasad's seizure of Plaintiff and Cain's use of force on Plaintiff; 2) a section 1983 claim for violation of the Fourteenth Amendment against Cain, Prasad, and Tornabene based on the seizure and use of force; 3) assault and battery against Cain, Prasad, and the County; 4) intentional infliction of emotional distress against Cain, Prasad, and the County; and 5) negligence against Cain, Prasad, and the County.

Defendants now move to dismiss.

## II.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

United States District Court
Northern District of California

the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94 (2007) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## III.    DISCUSSION

Defendants move to dismiss all claims against Tornabene and Prasad; the Fourteenth Amendment claim in its entirety; and the Fourth Amendment claim against Cain to the extent that it is based on the allegation that Plaintiff was seized when he was ordered to leave the hospital and forced to take a taxi.

### A.    Fourteenth Amendment Claim

In his opposition, Plaintiff clarified that his Fourth and Fourteenth Amendment claims are each based on the same three individual violations: 1) "forcing and escorting plaintiff out of the hospital for fraudulent reasons without justification"; 2) "forcing plaintiff to take a taxi against his will without justification"; and 3) Cain's excessive use of force. Opp'n 2. He contends that all three violations were seizures. *Id*.

"[I]f a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Claims for

unreasonable seizures and excessive force fall within the Fourth Amendment. *Terry v. Ohio,* 392 U.S. 1, 9 (1968); *Graham v. Connor,* 490 U.S. 386, 395 (1989). As Plaintiff has explained that his Fourteenth Amendment claims are based on the same three violations that he asserts under the Fourth Amendment for unreasonable seizure and excessive force, his Fourteenth Amendment claims are dismissed with prejudice.

### B. Fourth Amendment Claims

Section 1983 creates a civil cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives another person of any of their "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ketchum v. Alameda Cty.*, 811 F.2d 1243, 1245 (9th Cir. 1987).

As noted, Plaintiff's Fourth Amendment claims against Tornabene, Cain, and Prasad are based on three individual violations: 1) "forcing and escorting plaintiff out of the hospital for fraudulent reasons without justification"; 2) "forcing plaintiff to take a taxi against his will without justification"; and 3) Cain's use of excessive force. Opp'n 2.

Defendants argue that the first two alleged violations are not seizures within the meaning of the Fourth Amendment, and that even if they were seizures, Defendants are entitled to qualified immunity. They also argue that Tornabene and Prasad cannot be held liable for Cain's use of force. The court will address each individual violation in turn.

### 1. Forcing Plaintiff to Leave the Hospital

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation omitted;

emphasis removed); *see also United States v. Smith*, 633 F.3d 889, 892 (9th Cir. 2011) (holding

that "a person is not 'seized' within the meaning of the Fourth Amendment unless "by means of

physical force or show of authority, his freedom of movement is restrained.'" (quoting *United*

*States v. Mendenhall*, 446 U.S. 544, 553 (1980)).  "[I]n order to determine whether a particular

encounter constitutes a seizure, a court must consider all the circumstances surrounding the

encounter to determine whether the police conduct would have communicated to a reasonable

person that the person was not free to decline the officers' requests or otherwise terminate the

encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).  Under *Terry* and its progeny, a

temporary seizure is reasonable under the Fourth Amendment if law enforcement officers have

"reasonable suspicion"—that is, "articulable suspicion that a person has committed or is about to

commit a crime." *Florida v. Royer*, 460 U.S. 491, 498 (1983).

Plaintiff argues that Cain and Prasad ordered him to leave the hospital, and that based on

their "show of authority and command, plaintiff complied because he did not believe he could

have terminated the encounter or declined the deputies' command to leave" by returning to his

private room.  Opp'n 2-3.  Given these circumstances, he argues that the FAC alleges a seizure

within the meaning of the Fourth Amendment.  At the hearing, Plaintiff's counsel confirmed that

the FAC does not allege that anyone used physical force when requiring Plaintiff to leave the

hospital.

Plaintiff does not cite any cases to support his theory that Defendants' command to leave

the hospital, unaccompanied by force, constituted a seizure.[2]  The court was unable to find any

Ninth Circuit authority on the issue of whether a state actor's "command to leave" a public place,

unaccompanied by force or threats of force, constitutes a seizure, but at least two other circuits

have considered the question.  In *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005),

the Sixth Circuit held that a plaintiff could maintain a claim for unlawful seizure where he alleged

that an officer "ordered him to walk his bicycle out of [a suburb] back to [the neighboring city],

---

[2] The court analyzes only whether Plaintiff's allegations that he was forced to leave the hospital
constitutes a "seizure" under the Fourth Amendment.  The court does not reach the question of
whether Plaintiff adequately alleged that Defendants lacked reasonable suspicion to support the
alleged seizure.

and then 'escorted' him there," where the officer "watched him cross [the dividing road] Eight Mile to ensure that he complied" but did not physically escort him into the neighboring city. According to the Sixth Circuit, "Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action." *Id*. (emphasis in original).

The Second Circuit reached a different conclusion in *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994). In *Sheppard*, the court held that the plaintiff, a law clerk, had not alleged a seizure for purposes of the Fourth Amendment where he alleged that he was "removed from chambers by court officers" after being fired by a judge and was "not allowed to take his belongings with him." *Id*. at 150. The court held that the plaintiff's removal was not a seizure because he "was 'free to go anywhere else that he desired,' with the exception of [the judge's] chambers and the court house." *Id*. at 153. The Second Circuit subsequently affirmed its holding in *Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015):

> Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes.

(citing *Sheppard*, 18 F.3d at 153). The court in *Salmon* concluded, however, that "the intentional use of physical force to restrain the person and control the movements of a compliant person certainly does" transform an "encounter, even if only briefly, into a detention, which qualifies as a seizure of [an individual's] person." *Salmon*, 802 F.3d at 254. Notably, the Sixth Circuit's approach may now be more in line with the Second Circuit, for the Sixth Circuit recently agreed with the court in *Salmon* and held that a person is not seized under the Fourth Amendment when ordered to leave a place and escorted out by officers who use force that does not "exceed guiding force." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 523-24 (6th Cir. 2019) (citing *Salmon*, 802 F.3d at 253).

Although it appears that the Ninth Circuit has not considered this question, at least one district court in this circuit has applied *Sheppard* and granted summary judgment on a Fourth Amendment unlawful seizure claim, holding that no seizure occurred where the plaintiff had been "escorted" out of a courthouse by security officers "without any force whatsoever." *Price v. Peerson*, No. CV 13-3390 PSG (JEMx), 2014 WL 12579823, at \*8 (C.D. Cal. May 15, 2014).

The court need not determine whether the Ninth Circuit would adopt the Sixth Circuit's approach in *Bennett* and *Youkhanna* or the Second Circuit's decisions in *Sheppard* and *Salmon*, because it concludes that dismissal of the claim on the basis of qualified immunity is appropriate.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Moss v. U.S. Secret Serv.*, 675 F.3d 1213, 1222 (9th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Where "defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), 'dismissal is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies.'" *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)).

The qualified immunity analysis involves two inquiries. First, taken in the light most favorable to the plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established." *Id*. The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"The linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1075 (9th Cir. 2011) (citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it

11

1    would be clear to a reasonable officer that his conduct was unlawful in the situation he

2    confronted." *Saucier*, 533 U.S. at 202. "If the law did not put the officer on notice that his

3    conduct would be clearly unlawful, summary judgment based on qualified immunity is

4    appropriate." *Id.* "A clearly established right is one that is 'sufficiently clear that every

5    reasonable official would have understood that what he is doing violates that right.'" *Mullenix v.*

6    *Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664

7    (2012)). The Supreme Court has cautioned that specificity in determining whether "the violative

8    nature of *particular* conduct is clearly established . . . is especially important in the Fourth

9    Amendment context, where the Court has recognized that it is sometimes difficult for an officer to

10   determine how the relevant legal doctrine . . . will apply to the factual situation the officer

11   confronts." *Mullenix*, 136 S. Ct. at 308 (emphasis in original; quotation omitted). A court

12   determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit

13   law existing at the time of the alleged act." *Community House, Inc. v. Bieter*, 623 F.3d 945, 967

14   (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). Finally, "[i]t is the

15   plaintiff who bears the burden of showing that the rights allegedly violated were clearly

16   established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal

17   quotation marks and citation omitted).

18        Without reaching the question of whether the conduct alleged in the FAC, including

19   Defendants "forcing and escorting plaintiff out of the hospital for fraudulent reasons without

20   justification," shows that Plaintiff's constitutional rights were violated, the court concludes that

21   Plaintiff cannot establish the second prong of the qualified immunity analysis. Plaintiff does not

22   identify any authority that would have put Defendants on notice that they could effect a seizure

23   within the meaning of the Fourth Amendment by ordering Plaintiff to leave the hospital

24   accompanied only by a "show of authority and command," without any use of physical force.

25   Plaintiff argues that he need not identify Supreme Court or Ninth Circuit authority that would have

26   put Defendants on notice that their actions in ordering him to leave the hospital, without more,

27   constituted a seizure under the Fourth Amendment. Instead, he asserts that "[c]learly established

28   law is not always required" where there is a "clear violation" of an individual's constitutional

rights. Opp'n 10-11. In support, he cites *Rodriguez v. Swartz*, 899 F.3d 719, 726-27 (9th Cir. 2018), in which the plaintiff alleged that "[a] U.S. Border Patrol agent standing on American soil shot and killed a teenage Mexican citizen who was walking down a street in Mexico . . . [w]ithout warning or provocation." At the time of the shooting, the boy "was not committing a crime" and "did not otherwise pose a threat to [the agent] or anyone else." *Id*. at 727. The Ninth Circuit affirmed the district court's denial of qualified immunity, holding that the complaint alleged a Fourth Amendment violation and that it was clearly established that the agent could not shoot the boy in the circumstances alleged. *Id*. at 728, 732-33. The court rejected the agent's argument that at the time of the shooting, "it was not clearly established that he could not shoot someone on the other side of the border," holding that "[a]ny reasonable officer would have known, even without a judicial decision to tell him so, that it was unlawful to kill someone—anyone—for no reason." *Id*. at 732-33. Similarly, in *Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017), the Ninth Circuit rejected the defendants' claim that "the specific granular right to be free from deliberately fabricated evidence in *civil* child dependency proceedings where a parent's or child's protected familial liberty interest is at stake had not yet been 'clearly established' prior to the dependency proceeding at issue" in that case. *Id*. (emphasis in original). The court held that "[n]o official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law." *Id*.

Rodriguez* and other cases holding that a right may be clearly established despite "the lack of a case on all fours" do not support Plaintiff's position. *See Rodriguez*, 899 F.3d at 733. Unlike the allegations in *Rodriguez* and *Hardwick*, the facts alleged in Plaintiff's FAC do not establish "conduct so clearly and obviously wrong that the conduct itself unmistakably 'should have provided [defendants] with some notice' that their alleged conduct violated [Plaintiff's] constitutional rights." *Hardwick*, 844 F.3d at 1120 (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)). At the time of the incident alleged in the FAC, there was no published Supreme Court or Ninth Circuit case law that addressed whether an order to leave a place, unaccompanied by any physical force, would be a seizure under the Fourth Amendment and thus unlawful in the absence of reasonable suspicion that the recipient of the order has committed or is about to commit a

crime. The differing jurisprudence in the Second and Sixth Circuits further buttress the conclusion that the conduct alleged by Plaintiff in this case was not "clearly and obviously wrong." The court concludes that the law was not clearly established at the time of the incident that Defendants could effect a seizure in such circumstances. Defendants are thus entitled to qualified immunity on this claim.[3]

### 2. Forcing Plaintiff to Depart the Hospital in a Taxi

Plaintiff next claims that Defendants violated the Fourth Amendment by "forcing plaintiff to take a taxi against his will without justification." Opp'n 2. Defendants argue that requiring Plaintiff to take a taxi from the hospital does not constitute a seizure as a matter of law. The court disagrees. Accepting the allegations in the FAC as true, the court concludes that Plaintiff has alleged a seizure within the meaning of the Fourth Amendment. In refusing to allow Plaintiff to drive himself home in his car, Defendants "'by means of physical force or show of authority,' terminate[d] or restrain[ed] [Plaintiff's] freedom of movement." *See Brendlin*, 551 U.S. at 254. Further, Plaintiff alleges that he "did not believe he was free to decline the deputies' commands to leave the hospital and take a taxi, or terminate the encounter." FAC ¶ 31; *see Bostick*, 501 U.S. at 439 (courts must "determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.").

Defendants assert that even if requiring Plaintiff to take a taxi constituted a seizure, they are entitled to qualified immunity because there is no authority "that would have made it clear to every reasonable hospital administrator and law enforcement officer that paying for a taxi for a doctor showing signs of impairment to leave the hospital constituted a seizure or an unreasonable seizure." Reply 4. Defendants' argument ignores the allegations in the complaint. At the time of the incident, the law was clearly established that "a temporary seizure is reasonable under the

---

[3] In his opposition, Plaintiff argued that Tornabene is not entitled to qualified immunity because she is a "private party," even though the FAC alleges that Tornabene "was at all times mentioned [in the FAC] the medical director" for the County-owned and operated hospital, and thus a County employee. *See* FAC ¶ 5. At the hearing, Plaintiff conceded that Tornabene was a state actor during the incident.

Fourth Amendment if law enforcement officers have 'reasonable suspicion'—that is, 'some objective manifestation' under the circumstances—that the person has committed, or is about to commit, a crime." *United States v. Harger*, 313 F. Supp. 3d 1082, 1087 (N.D. Cal. 2018) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981), *Terry*, 392 U.S. at 30); *see Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) ("The reasonable suspicion standard 'is a less demanding standard than probable cause,' and merely requires 'a minimal level of objective justification.'" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Further, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In order to evaluate the reasonableness of a detention, courts must examine whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain" the individual challenging the detention. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Here, Plaintiff alleges that Tornabene contacted the Sheriff's Department for assistance and told Cain that "she believed plaintiff was under the influence of drugs or alcohol," and that "plaintiff should not be permitted to drive himself home." FAC ¶ 17. However, by the time Plaintiff departed the hospital in a taxi, he had "stated he did not use drugs" to Cain, Prasad, and Tornabene; explained why his speech was slurred, including removing and showing his partial denture to Defendants; explained the reason for his difficulty walking, including displaying his right leg and ankle; and made multiple requests to Tornabene, Cain, and Prasad for a drug, alcohol, or sobriety test. *Id*. at ¶¶ 22, 23, 24, 26-27. Plaintiff's requests for a drug, alcohol, or sobriety test were repeatedly denied, and Cain and Prasad took no action to independently confirm Tornabene's suspicions that Plaintiff was under the influence of drugs or alcohol, even failing to ask him if he had consumed drugs or alcohol that day. *Id*. at ¶¶ 26-27. Under these circumstances, and accepting these allegations as true, Plaintiff has stated a cognizable, albeit limited claim that Defendants effectuated a seizure by making him take a taxi and refusing to let him drive his own car without first performing an investigation which would have dispelled any suspicion that he was under the influence of drugs or alcohol. *See Gallegos*, 308 F.3d at 991

("The whole point of an investigatory stop, as the name suggests, is to allow police to *investigate* . . ." (emphasis in original)). Accordingly, dismissal of this claim based on qualified immunity is denied. This denial is without prejudice to Defendants' renewing the defense on a full record at summary judgment. *See Romero v. Cty. of Washoe*, 602 Fed. Appx. 408, 409 (9th Cir. 2015) (affirming denial of motion to dismiss with leave to pursue qualified immunity defense at summary judgment).

### 3. Excessive Force

Defendants next argue that Tornabene and Prasad cannot be held liable for Cain's alleged excessive use of force, as neither was present when Cain used force on Plaintiff. They do not challenge the excessive force claim as to Cain.

Generally, a government official is only liable for his or her own misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("In a § 1983 suit . . .where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). However, an officer may be liable for conduct where there has been "integral participation . . . in the alleged constitutional violation." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1206 (9th Cir. 2008) (citing *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996)). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004). It does, however, require some fundamental involvement in the conduct that allegedly caused the violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). "A person deprives another of a constitutional right within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978)) (internal quotations and alterations omitted). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.* (citations omitted). The

Ninth Circuit has rejected the "team effort" standard that allows a jury to consider defendants' conduct together; the proper measure is "to base each individual's liability on his own conduct." *Hopkins v. Bonvicino*, 573 F.3d 752, 769-70 (9th Cir. 2009) (holding that "integral participation" requires "more participation" than where officer interviewed a witness, did not participate in the unconstitutional search, and had conversations with officers who did conduct the search (citing *Chuman*)); *see also Boyd*, 374 F.3d at 780 (rejecting "team effort" theory "because it allowed liability to attach to 'a mere bystander' who had 'no role in the unlawful conduct.'").

Here, Plaintiff asserts that Prasad and Tornabene are liable for Cain's excessive use of force under an integral participation theory.[4] A law enforcement officer who does not personally apply force may nonetheless be held liable for excessive force where the officer meaningfully participated in the conduct that allegedly caused the violation. For example, in *Blankenhorn*, the Ninth Circuit found that an officer was not entitled to summary judgment and could be held liable under section 1983 as an integral participant where he arrived during a struggle between the plaintiff and other officers and "grabbed and held" the plaintiff's arm so that it could be handcuffed, and in this manner, meaningfully participated in gaining control over the plaintiff, culminating in another officer's application of hobble restraints. *Blankenhorn*, 485 F.3d at 481 n.3, 12. An officer can also be held liable as an integral participant where he or she had an opportunity to intervene and prevent or curtail the violation (e.g., enough time to observe what was happening and intervene to stop it) but failed to do so. *Sturgis v. Brady*, No. C 08-5363 SBA (PR), 2016 WL 924859, at *8 (N.D. Cal. Mar. 11, 2016) (citing *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995)).

Here, the FAC does not allege that either Tornabene or Prasad were present when Cain

---

[4] Plaintiff argued in his opposition that Tornabene may be held liable for Cain's use of force pursuant to a "joint participation" or "acting in concert" theory. Opp'n 5-6. However, the cases Plaintiff cited address the circumstances under which a private party may be liable under section 1983. *See, e.g.*, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153 (1970) ("a private party involved in [a conspiracy to discriminate based on race], even though not an official of the State, can be liable under § 1983. Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute." (quotation omitted)). As noted above, the FAC alleges that Tornabene was "at all times" the hospital's medical director, and thus a County employee. At the hearing, Plaintiff's counsel conceded that the joint participation or acting in concert theories are not applicable to Tornabene because she is not a private actor.

17

"twist[ed] [Plaintiff's] hand and wrist into a martial arts submission hold" and dragged him out of his car. *See* FAC ¶ 33. However, Plaintiff asserts that both were integral participants in Cain's use of force. As to Tornabene, Plaintiff notes that she asked the officers to remove Plaintiff from the hospital and directed them to put him in a taxi instead of permitting him to drive himself home. Tornabene believed Plaintiff might become "confrontational" when being removed, *see* FAC ¶ 17, and Plaintiff asserts that implicit in her directions was the understanding that the officers may need to use force on Plaintiff if he did not comply with their directions. However, Plaintiff alleges that Cain used force to pull him out of his car after Plaintiff pressed the ignition and started the car to see if the keys were inside. There are no allegations that Tornabene knew that Cain and Plaintiff were going to the parking lot to look for Plaintiff's keys or that Plaintiff planned to attempt to start the car to see if the keys were inside. Therefore, no facts suggest that Tornabene directed or encouraged Cain's use of force in that situation or otherwise meaningfully participated in his use of force.

As to Prasad, Plaintiff argues that she is liable in her capacity as Cain's supervising officer for "fail[ing] to properly train Cain . . . on the proper use of force." Opp'n 12. The Ninth Circuit has held that a supervisor may be held liable in their individual capacity for a constitutional violation committed by another if the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he [or she] knew or reasonably should have known, would cause others to inflict the constitutional injury." *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). A supervisor may also be held liable "for his [or her] own culpable action or inaction in the training, supervision, or control of his [or her] subordinates; for his [or] her acquiescence in the constitutional deprivation . . . ; or for conduct that showed a reckless or callous indifference to the rights of others." *Id*. (quoting *Larez*, 946 F.2d at 646).

Here, the FAC contains no allegations that Prasad set in motion a series of acts that she knew or should have known would cause Cain to use force on Plaintiff. Nor does it allege any facts about Prasad's "action or inaction in the training, supervision, or control" of Cain with respect to the use of force or allege that she acquiesced in Cain's use of force on Plaintiff. Like

18

Tornabene, the FAC does not allege that Prasad knew that Cain and Plaintiff were going to the parking lot to look for Plaintiff's keys, was present when Cain and Plaintiff went to Plaintiff's car to look for his keys, had any knowledge that Plaintiff planned to attempt to start the car to see if the keys were inside, or knew that Cain would use force to remove Plaintiff from the car once the engine started. The FAC also does not allege any facts about Cain's training in the use of reasonable force.

Based on the foregoing, the court concludes that the FAC fails to state a claim for excessive force against Tornabene and Prasad.

### C.    State Law Claims Against Prasad

The remaining state law claims are assault, battery, intentional infliction of emotional distress, and negligence. Defendants move to dismiss each of these claims as alleged against Prasad, arguing that such claims fail as a matter of law.

#### 1.    Assault and Battery

Plaintiff's assault and battery claims are based upon Cain's use of force on Plaintiff. FAC ¶¶ 67-68.

The elements of a claim for assault under California law are that "(1) the defendant threatened to touch the plaintiff in a harmful or offensive manner; (2) it reasonably appeared to the plaintiff that the defendant was about to carry out the threat; (3) the plaintiff did not consent to the defendant's conduct; (4) the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citations omitted). A claim for battery under California law requires a plaintiff to establish that "(1) the defendant touched the plaintiff or caused the plaintiff to be touched with the intent to harm or offend the plaintiff; (2) the plaintiff did not consent to the touching; (3) the plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's situation would have been offended by the touching." *Id*. at 1130-31.

Here, the FAC does not allege any facts to suggest that Prasad "threatened to touch" Plaintiff "in a harmful or offensive manner" or that Prasad actually touched Plaintiff "with the intent to harm or offend" him. At the hearing, Plaintiff asserted that Prasad may be held

19

vicariously liable for Cain's assault and battery of Plaintiff because she failed to train Cain on the proper use of force and directed him to follow Tornabene's instructions to remove Plaintiff from the hospital without conducting an independent investigation. He offered no support for either theory. Further, as discussed above, the FAC alleges no facts about Cain's training with respect to the use of force. As to the second theory, there is no logical connection between Prasad's alleged direction to follow Tornabene's instructions without conducting an investigation and Cain's alleged eventual assault and battery of Plaintiff. The court concludes that the FAC does not state a claim for assault or battery against Prasad.

## 2. Intentional Infliction of Emotional Distress

In order to state a claim for intentional infliction of emotional distress ("IIED") Plaintiff must allege "(1) extreme and outrageous conduct by [Prasad] with the intention of causing, or reckless disregard of the probability of causing, emotional distress"; (2) that Plaintiff "suffer[ed] severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by [Prasad's] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id*. at 1051 (citations and quotation marks omitted). Behavior "may be considered outrageous if a defendant . . . abuses a relation or position which gives him power to damage the plaintiff's interest." *Cole v. Fair Oaks Fire Dept*., 43 Cal. 3d 148, 155 n.7 (1987).

While Plaintiff's IIED claim is based upon both Cain's use of force and Prasad's "personal involvement in the unlawful seizure and assault" on Plaintiff, *see* FAC ¶ 76-79, the FAC alleges that "Cain's outrageous conduct was the actual and proximate cause of plaintiff's emotional distress." It does not allege that Prasad's own actions were "outrageous" or that they caused Plaintiff's emotional distress. Further, as discussed in connection with the assault and battery claims, Plaintiff offers no authority that Prasad may be held liable for Cain's own alleged "outrageous conduct." Accordingly, Plaintiff has not stated an IIED claim against Prasad.

## 3. Negligence

In order to establish a negligence claim, Plaintiff must plead "(1) a legal duty to use due

20

care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cnty. of San Mateo*, 12 Cal.4th 913, 917 (1996)). Under California law, "police officers have a duty not to use excessive force." *Id*. (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1101 (2004)).

Like the IIED claim, Plaintiff's negligence claim is based upon both Cain's alleged excessive use of force and Prasad's "personal involvement in the unlawful seizure and assault" on Plaintiff. FAC ¶¶ 83, 85. However, the FAC alleges that only Cain owed Plaintiff a duty "to exercise reasonable care under the circumstances." *Id*. at ¶ 83. It does not allege that Prasad owed Plaintiff a legal duty, that she breached any such duty, or that the breach proximately caused an injury to Plaintiff. Further, Plaintiff offers no authority that Prasad may be held liable for Cain's own alleged negligence. The FAC thus fails to state a claim for negligence against Prasad.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Plaintiff's Fourteenth Amendment claims are dismissed with prejudice. The following claims are dismissed with leave to amend: Fourth Amendment claim against Tornabene, Cain, and Prasad based on forcing Plaintiff to leave the hospital; Fourth Amendment claim against Tornabene and Prasad based on Cain's alleged excessive use of force; and assault and battery, intentional infliction of emotional distress, and negligence claims against Prasad. Any second amended complaint is due **by no later than November 12, 2019**.[5] Further, as discussed at the hearing, Plaintiff is granted leave to allege a claim for defamation in the second amended complaint. The second amended complaint must plead Plaintiff's best case.

**IT IS SO ORDERED.**

Dated: October 15, 2019

_____
Donna M. Ryu
United States Magistrate Judge

---

[5] The court is granting Plaintiff additional time to file a second amended complaint in light of the fact that Plaintiff's counsel has been granted leave to withdraw from his representation of Plaintiff and Plaintiff is currently proceeding pro se in this matter. [*See* Docket No. 51.]