John E. Cowan (SBN: 168110)
Law Offices of John E. Cowan
100 Pine St., Suite 1250
San Francisco, CA 94111
Telephone: (888) 252-1231
Facsimile: (415) 554-3743
john@johncowanlaw.com

Attorney for Plaintiff,
Walter Walters

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER WALTERS,<br><br>    Plaintiff,<br><br> vs.<br><br>COUNTY OF CONTRA COSTA; BRIAN CAIN; FELICIA I. TORNABENE; ANGELA D. PRASAD; and DOES 1-100, inclusive,<br><br>    Defendants. | Case No.: 4:19-cv-00702 DMR<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES**<br>1. **Violation of Civil Rights Under Fourth Amendment to the U.S. Constitution**<br>2. **Assault and Battery;**<br>3. **Intentional Infliction of Emotional Distress**<br>4. **Negligence**<br>5. **Defamation**<br><br>**Jury Trial Demanded** |

COMES NOW, plaintiff WALTER WALTERS, and alleges as follows:

  1. Plaintiff is and was at all times mentioned herein a citizen of the State of Nevada.  Plaintiff is a physician who is duly licensed to practice medicine in the State of California.

  2. Defendant County of Contra Costa ("the County") is a public entity located in the State of California.

3.      Defendant Brian Cain ("Cain") was at all times mentioned herein a Deputy Sheriff employed by the County of Contra Costa.  Plaintiff alleges on information and belief that Cain is a citizen of the State of California.

4.      Defendant Angela D. Prasad was at all times mentioned in this complaint a sergeant employed by the County Sheriff's Department.  Plaintiff alleges on information and belief that Prasad is a citizen of the state of California.

5.      Defendant Felicia I. Tornabene ("Tornabene") was at all times mentioned herein the medical director for Contra Costa County Regional Medical Center ("CCRMC" or "hospital") located in the city of Martinez, County of Contra Costa, State of California. CCRMC is a public hospital owned and operated by the County. Plaintiff alleges on information and belief that Tornabene is a citizen of the State of California.

6.      The jurisdiction of this Court over the subject matter of this action is predicated on 28 USC section 1331 federal question jurisdiction. This action arises under (a) the Federal Civil Rights Act (42 USC §1983); and (b) the United States Constitution, Fourth Amendment.

7.      The jurisdiction of this Court over the subject matter of this action may also be predicated on 28 USC §1332 diversity jurisdiction in that it is a civil action between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

8.      Venue is proper because all defendants reside in this state and one of the defendants resides in this district. In addition, venue is proper because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this district.

9.      INTRADISTRICT ASSIGNMENT. This civil action arose in the County of Contra Costa and pursuant to Civil Local Rule 3-2(c) it has been assigned to the Oakland Division.

10.     Plaintiff does not know the true names and capacities of the defendants sued herein as DOES 1-100, inclusive, and therefore plaintiff sues those defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the acts and

omissions alleged herein, and that plaintiff's damages were proximately caused by such defendants. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants were the principals, agents, employers, employees, representatives, assignors, assignees, masters, servants, hirers, contractors, parent companies, subsidiary companies, and co-conspirators of each other, and in doing the acts alleged herein, were acting within the course and scope of such agency, employment, representation, service, and conspiracy, and with the knowledge, consent, permission, and ratification of each of their co-defendants. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

11.     Plaintiff is an African American physician practicing in the field of anesthesiology. He contracted with a medical temporary staffing agency to be placed at health care facilities that needed locum tenens (temporary) physicians. The agency assigned plaintiff to work at CCRMC in or about October 31, 2017, when he began his orientation program there. Prior to his assignment, plaintiff informed the agency that he would accept the assignment on the condition that he work only 8-hour shifts Monday through Friday from 7:00 a.m. to 3:00 p.m.

12.     Plaintiff had recently suffered an illness which caused him to lose approximately 30 pounds in one month. He did not want to work long, exhausting shifts while he attempted to determine the cause of his illness. The agency agreed to plaintiff's request and replied it would inform the hospital to schedule his shifts accordingly.

13.     Plaintiff's orientation and training session began in or about October 31, 2017. His first scheduled shift was for 12 hours on November 3rd, 2017. The 12-hour shift was contrary to his contractual agreement. Plaintiff was also scheduled to work a 12-hour shift on Sunday, November 5th . Since plaintiff agreed to work only 7:00 a.m. to 3:00 p.m. shifts from Monday through Friday, he complained to Tornabene. He told her of his prior request to the agency to work only 8-hour shifts because of his extreme weight loss and exhaustion during longer shifts. He told her he suffered from inflammatory bowel disease (IBD). He told her he had some difficulty walking, particularly if he had to walk or stand during long shifts. He explained this was due to psoriasis on his leg and a painful

ankle due to surgery which required the installation of numerous metal screws. Plaintiff explained that working long shifts weakened him and caused him pain.  Tornabene acknowledged plaintiff's concerns, apologized, and informed him she would look into the matter.

14.     Plaintiff later discovered that despite what he was told when he agreed to the contract, the anesthesia department did not have 7:00 a.m. to 3:00 p.m. shifts, and it only had 7:00 a.m. to 5:30 p.m., 7:00 a.m. to 7:00 p.m., and 24-hour shifts. Staffing agencies and hospitals sometimes mislead locum tenens physicians regarding shift assignments because they often find it difficult to fill vacancies. In the ensuing weeks, plaintiff's IBD, though not resolved, improved to the extent he could work longer shifts. However, despite his conversation with Tornabene, in or about the middle of November plaintiff discovered he was scheduled to work a 24-hour shift on December 28th and a 12-hour shift on December 29th . Plaintiff complained to Jeffrey Saadi, the Chief of Anesthesia, saying he could not work a continuous 36-hour shift due to his rheumatoid arthritis and the surgery to repair a pilon fracture of his right ankle. He told Saadi he could work one of the shifts, but not both. Plaintiff explained that in addition to the pain from his hand and ankle when working long shifts, his IBD caused him to be dehydrated thus requiring him to drink plenty of fluids. Saadi was scheduled to be on vacation during the Christmas holidays on December 28th and 29th. He told plaintiff he would talk to Dr. Tung, who was responsible for scheduling, about the matter.

15.     Plaintiff thereafter spoke to Dr. Tung, stating he could not work both shifts consecutively. He told Dr. Tung that December 29th was his last day under his contract and he requested that day off since he was scheduled to work a 24-hour shift the previous day.

16.     Plaintiff provided competent care to hospital patients without incident or complaints during the entire term of his assignment. Plaintiff worked the 24-hour shift on December 28th but despite his complaints, the hospital still scheduled him to work the 12-hour shift on December 29th. Plaintiff nevertheless appeared for and worked on the 29th out of a sense of duty because the hospital needed anesthesia coverage on that day.

During breaks in between cases on the 29th, plaintiff retired to his private call room where he would rest or sleep. After performing a procedure, plaintiff was told by a nurse that a patient said his eyes were red. The nurse also said his speech sounded slurred. Plaintiff did not respond because he was tired and did not believe it was necessary to explain his private medical conditions (among other things, plaintiff wears dentures that sometimes affect his speech, as is set forth below) and his disputes with the scheduling department.

17.     Later that day, during a break, plaintiff was awoken to hear a knock on the door to his private room. He opened it to find Tornabene and two nurses waiting outside. One of the nurses asked "Do you know who I am?" Plaintiff answered yes. One of the three asked if he was feeling okay. Plaintiff answered yes. The three left without explaining to plaintiff the reason for their questions. They did not discuss with him whether or not they thought his responses were sufficient. After they left, plaintiff closed the door and went back to sleep.

18.     Unbeknownst to plaintiff, Tornabene contacted the Contra Costa County Sheriff's Department. She made a determination that plaintiff was under the influence of either drugs or alcohol even though she did not physically examine or give him a blood test. She requested the Sheriff's Department to provide security to remove plaintiff from the hospital. When defendant Cain arrived in response to Tornabene's call, she told Cain that although she believed plaintiff was under the influence of drugs or alcohol, she did not want him to arrest or prosecute plaintiff. She told Cain she would handle the incident "administratively" instead. She told Cain that instead of arresting plaintiff, he should escort him out of the hospital and put him in a taxi. She told Cain that plaintiff should not be permitted to drive himself home. Tornabene told Cain she also desired his presence as security if plaintiff became "confrontational" when she told him he was being removed.

19.     Cain called dispatch for assistance. Sargeant Angela D. Prasad arrived as Cain's supervisor. (She is currently a Lieutenant.) The two deputy sheriffs agreed with Tornabene that they would follow her directions in handling this matter.

20.     Cain knocked on plaintiff's door, awakening him. Plaintiff opened the door and saw only Cain, who was dressed in full uniform as a law enforcement officer. Cain closed the door just enough so that he could stick his head inside to talk to plaintiff. Only Cain and plaintiff could see each other through the door due to the small opening. In a firm tone of voice Cain said "come out here" because he wished to speak with him. Since plaintiff was tired from the long shift and had been sleeping partially undressed, he replied he did not wish to come out into the hallway. He asked Cain to enter the room and talk there instead while he got dressed. Cain said "No, you come out" because Tornabene wished to speak with him. Plaintiff believed he had no choice but to comply with Cain's command. He closed the door and began to get dressed.

21.     After a few minutes, Cain became impatient. He loudly pounded his fist on the door and with an angry tone of voice yelled "Come on, let's go!" Like many African Americans, plaintiff was fearful of any potential encounters with law enforcement. Furthermore, he did not want to give Cain, who had gotten an attitude, any reason to suspect he was disobeying his command, being uncooperative, or hiding something. He immediately complied and opened the door even though he was still in the process of getting dressed.

22.     Plaintiff exited his room to see Cain, Prasad, Tornabene, at least one nurse, and an unidentified, uniformed male who likely was a private security guard ("guard") rather than another sheriff's deputy. It appears the guard was summoned merely to observe the encounter as a witness along with the nurse(s).  Tornabene told plaintiff his services were no longer needed and another physician was assigned to finish his shift. She also told plaintiff he would not be allowed to drive himself home. She said the deputies would put him in a taxi and she would give him a prepaid voucher to pay the driver.

23.     Sometime during this encounter plaintiff stated he did not use drugs. He realized he was suspected of being under the influence of drugs in light of his questioning by Tornabene and the nurses, and the sudden appearance of the deputies and the guard. In addition, in the past a hospital asked plaintiff, who has been certified to prescribe

medications in the treatment of addiction to opioids, to aid in its investigation of a physician who was suspected of being under the influence of drugs while on duty. Under the circumstances, plaintiff deduced he was in the middle of a similar investigation in which he was the subject of the investigation.

24.     Plaintiff asked why his services were being terminated. Tornabene stated he did not appear as if he could work. When plaintiff asked for an explanation, Tornabene stated that his speech appeared to be slurred. Plaintiff explained that he had a denture (a partial) to replace some of his upper teeth. When he does not use glue to attach the partial to the inside of his mouth (particularly when he is resting or sleeping, such as when he was awoken by Tornabene and the deputies), he uses his tongue to keep it in place. In those situations, plaintiff's speech appears to be slurred when he speaks. Plaintiff took out his partial and showed it to Tornabene, the nurse(s), the deputies, and the guard.

25.     Tornabene also said that plaintiff appeared to have difficulty walking. Plaintiff pulled up his pant leg and revealed the psoriasis on his right leg. He also pointed to the surgery scar on his right ankle. He explained that he had screws surgically installed in his ankle to repair a fracture and that the pain caused him to limp when he was required to walk or stand for long periods. When plaintiff removed his denture and pointed to his leg conditions, he noticed that the nurse(s) gasped as if they had been deceived or mislead when told about plaintiff's purported lack of sobriety. Tornabene stated plaintiff still had to leave and take a taxi. At no point during this encounter did she mention the words "drugs" or "alcohol" to plaintiff in her comments.

26.     Plaintiff replied he did not want to take a taxi. He said he drove to the hospital in his own car and would drive himself home. One of the deputies told plaintiff they would not permit him to drive home. The deputy said plaintiff would be escorted out of the hospital and put into a taxi pursuant to Tornabene's request.

27.     Plaintiff continued to vehemently proclaim his innocence but to no avail. He told Tornabene, "If this is how you're going to do it, then I'm going to go downstairs, take a drug test, then sue you." He asked Tornabene to give him a drug test in the hospital's laboratory immediately to negate the accusation of drug or alcohol use.

Plaintiff knew that hospitals have a protocol requiring the testing for substance abuse of any physician who is suspected of being under the influence while on duty. The hospital's protocol during this incident required it to administer such a test upon plaintiff. If plaintiff refused the test, his refusal would be noted on the record for use as evidence in disciplinary proceedings that would later be initiated by the hospital and the state medical board. Tornabene refused plaintiff's request for a drug test even though she knew the hospital's protocol required it.  Plaintiff again asked to be tested a second time. Tornabene again refused.

28.     Plaintiff then asked the deputies to give him a drug, alcohol, or sobriety test. They also refused. Plaintiff stated that he was being kidnapped and that he could not be forced into a taxi without a drug test. During this encounter, Prasad on more than one occasion kept rushing Cain and plaintiff to leave because she had "somewhere to go." None of the deputies took any action to confirm Tornabene's unconfirmed suspicions. Among other things, they did not ask plaintiff if he had consumed any alcohol or drugs that day. They did not ask him to respond to the accusation, even though he unilaterally provided his provable explanations. They did not examine his eyes or pupils. They did not give him a breathalyzer or field sobriety test. They did not attempt to smell the odor of alcohol on his breath or his person. They did not search plaintiff's person, his property, or his room for evidence of drugs or alcohol. They did not conduct an adequate investigation to confirm Tornabene's accusation or independently establish probable cause to believe that plaintiff committed the suspected crime. They had a duty to conduct an adequate investigation and establish independent probable cause because plaintiff gave plausible explanations for his perceived behavior and he demanded a drug test multiple times. The deputies impermissibly substituted Tornabene's judgment for their own.

29.     Plaintiff went down the hallway to the locker room to get dressed in his street clothes. Cain accompanied him, never leaving his side. He packed his luggage in front of Cain, openly displaying its contents to show it did not contain any contraband. Cain viewed the bag's contents and did nothing. Plaintiff showed Cain both of his hands,

which were swollen. He explained they were swollen because he had rheumatoid arthritis.

30.     Plaintiff could not find his car keys or his cell phone. He returned to his room to look for them without success. Prasad became irritated and more forceful. She continued to rush plaintiff since she had somewhere to go. Plaintiff stopped looking and asked that he be contacted if his items were found.

31.     Plaintiff's rental car was in the parking lot. He wanted to make sure his keys did not drop on the floor or between the seats since this happened to him before with keyless ignition cars. He told Cain he wanted to look in the car for his keys to confirm they were not in the car and were in the hospital so he could retrieve them later.

32.     Plaintiff proceeded with Cain and the guard to leave the building and take a taxi to his hotel. He did not believe he was free to decline the deputies' commands to leave the hospital and take a taxi, or terminate the encounter. In the hallway, plaintiff became very distraught at the pain and humiliation of nurses, residents, students, and other physicians seeing him being kicked out of the building under armed guard.

33.     Prasad remained while Cain and the guard escorted plaintiff downstairs to the lobby. Plaintiff and Cain exited the building towards the parking lot while the guard remained in the lobby with plaintiff's luggage.

34.     In the parking lot, plaintiff and Cain searched plaintiff's vehicle for the car keys without success. Plaintiff informed Cain he was going to sit in the driver's seat and press the ignition button to see if the keys were in the vehicle. If the vehicle started, the keys were somewhere inside the vehicle. Cain said nothing and walked to the driver's side next to plaintiff, who sat in the driver's seat. Plaintiff then pushed the ignition button. When the vehicle started, Cain suddenly lunged at plaintiff, twisting his hand and wrist into a martial arts submission hold. He dragged plaintiff out of the vehicle by his hand and wrist and forced his arm behind his back.

35.     Plaintiff suffered extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder. He also experienced fright, nervousness, grief, anxiety, worry, mortification, shock, terror, humiliation, embarrassment, apprehension, and indignity. He

screamed in pain and yelled "What are you doing?!!" Cain said that plaintiff was trying to get away and that his keys were in his pocket. Plaintiff replied they were not. Cain instructed plaintiff to move away from the vehicle. After plaintiff complied, Cain sat in the driver's seat and started the car. Cain then took out his flashlight, searched the floor of the vehicle, and found the keys underneath the car seat. The two of them returned to the lobby where plaintiff recovered his luggage from the guard. Prasad later arrived in the lobby and gave plaintiff his cell phone. When the taxi arrived, plaintiff exited the building alone and entered the taxi. After plaintiff arrived at his hotel, he returned to the hospital shortly thereafter to retrieve his rental car. He drove away without incident. Pursuant to Tornabene's directions, the deputies did not arrest, charge, or prosecute plaintiff for any crime. Moreover, prior to December 29th, no one at the hospital ever complained to plaintiff about the quality of his services during the entire two months of his assignment.

36.    On December 30th, plaintiff traveled to his next assignment out of the area, where he worked on December 31st. On January 1, 2018, plaintiff flew to another state for his next assignment. On January 25, 2018, plaintiff took a substance abuse panel drug test administered by Quest Diagnostics Laboratory. The test sample was taken from plaintiff's underarm hair and urine. A hair follicle drug test detects signs of drug use for the 90 days preceding the test. Both test results were negative, proving that plaintiff was not under the influence when he was forced to leave the hospital. Plaintiff provided the hospital's medical executive committee with a copy of the test results on April 2, 2018 during the hospital's internal grievance proceedings.

37.    Plaintiff did not know until about a year later that certain physicians and nurses in the hospital's anesthesia department harbored racial animus towards him as an African American. This revelation came to light in the context of a pending case against the hospital in Contra Costa County Superior Court by a locum tenens anesthesiologist, Gary Greenberg, M.D., whose complaint alleges that Saadi terminated his assignment because of his Jewish heritage. According to Dr. Michael Brandon, a locum tenens anesthesiologist who worked at the hospital, when Brandon arrived for his first day of

work in November 2017, Saadi told him, "At least you're not a nigger or a Jew." Saadi specifically and contemptuously referred to plaintiff as the "nigger" in his comment. Brandon also overheard hospital nurses refer to plaintiff as a "nigger." Brandon explained Saadi's comments and the anesthesia department's toxic environment in a declaration executed under penalty of perjury on January 9, 2019.

38.     Plaintiff alleges that Tornabene, in conjunction with Saadi and some nurses, conspired to set up plaintiff to be terminated at the end of his shift, on his last day, when he fully performed his obligation under his contract and they no longer needed his services. Tornabene retaliated against plaintiff for complaining about his assigned shifts and because she and others in the hospital harbored racial animus against him as an African American. She caused him to be assigned the 36-hour shift on his final two days despite his complaints. She knew that such a demanding shift would weaken him and make it appear as if he was under the influence of drugs or alcohol, especially in light of his medical conditions which she had knowledge of.

39.     Tornabene intentionally gave Cain and the deputies false and misleading information regarding plaintiff's sobriety. She knew that plaintiff's slurred speech was caused by his denture moving in his mouth and that his difficulty walking was caused by his ankle surgery and psoriasis on his leg. Tornabene refused plaintiff's multiple requests to take a drug test despite the hospital's protocol because she knew the results would exonerate him and implicate her in her malicious plan to injure plaintiff.

40.     On December 29th when Tornabene and the other nurses questioned plaintiff prior to the deputies' arrival, she did not express her concern that he may have been under the influence or ask him for an explanation. She had a duty to explain her concerns to plaintiff and allow him to explain his behavior in the event her perception was mistaken. Tornabene knew that if she expressed her suspicion to plaintiff in the presence of the other nurses, he would have explained that his medical conditions (which she had knowledge of) caused them to misunderstand his behavior. Tornabene did not want the nurses, who apparently were present as witnesses, to realize that her accusation against plaintiff was false.

41.     Tornabene intentionally cold-cocked plaintiff with the sudden arrival of the three officers, the shocking and false accusation of his being under the influence, and her order that he be removed from the premises under police escort and forced into a taxi. She did so intending and knowing it was reasonably foreseeable that plaintiff, particularly in his fatigued state after forcing him to work the 36-hour shift, would indeed become so indignant and "confrontational" in his defense that he would react in a way that would justify the deputies in arresting or using force upon him. She also knew it was reasonably foreseeable that after working the 36-hour shift despite his protestations out of a sense of duty to the hospital and its patients, plaintiff's sense of betrayal would be so deep that he would react in a way that would justify the deputies in arresting or using force upon him.

42.     After the incident, Tornabene handled the matter "administratively" pursuant to what she told the deputies when she told them not to arrest plaintiff. She helped prepare the hospital's Business & Professions Code §805(b)(2) report for physician misconduct which it submitted to the California Medical Board. Even though Tornabene told the deputies she suspected plaintiff of being under the influence of drugs or alcohol, the 805 report did not state the hospital believed plaintiff was under the influence of drugs or alcohol. Moreover, the words "drugs" or "alcohol" were never used in the report. This indicates Tornabene knew her accusation was false.

43.     The 805 report never mentioned that plaintiff asked for a drug test, or that Tornabene refused his request. It did not mention whether Tornabene asked plaintiff to take the test.

44.     The report stated that plaintiff's practice privileges were suspended for, among other things, "difficulty walking and talking…" However, Tornabene knew plaintiff had plausible explanations for those accusations. Moreover, she did not include plaintiff's explanations regarding his denture, ankle surgery, or psoriasis in the report.

45.     As part of his defense in the hospital's internal grievance proceedings, on April 2, 2018 plaintiff also submitted to the medical executive committee a copy of an x-ray showing the numerous screws and other hardware installed in his ankle.

46.     The 805 report also stated that plaintiff's privileges were suspended for "…acting inappropriately in front of patients by discussing plans for a trip with a phone interpreter." This irrelevant fact would not support the filing of an 805 report. Tornabene padded the report with false and irrelevant information to injure plaintiff further because she knew he was not under the influence. Her plan from the very start was to set up plaintiff so that the state medical board would revoke his license to practice medicine after the hospital filed the 805 report. Her plan was also to provoke plaintiff to become so confrontational that the deputies would have cause to arrest or use force upon him.

47.     The hospital responds to inquiries from other health care providers regarding the status of certain physicians who worked there. In September 2018 a healthcare facility who was vetting plaintiff for prospective employment learned of the 805 report and contacted the hospital for an explanation. The hospital responded to the inquiry by issuing an Affiliation Verification dated September 19, 2018 which stated: "Review of the practitioner's file indicates that this practitioner is in good standing and there is no derogatory information recorded." A true and correct copy of the verification is attached hereto as EXHIBIT B and incorporated herein by this reference. This further indicates that Tornabene knew plaintiff was not under the influence on December 29th.

**First Cause of Action for Violation of Fourth Amendment
to U.S. Constitution
(Against Defendants County of Contra Costa Cain, Prasad, and Tornabene)**

48.     Plaintiff incorporates by reference each and every allegation above as though fully set forth herein.

49.     Cain and Prasad restrained plaintiff's liberty and made a seizure of his person. Plaintiff did not wish to leave his private room or the hospital, and he did not want hospital staff and colleagues see him being forced to leave and forced into a taxi by a cluster of armed officers like a criminal because he did not commit a crime. Plaintiff did not believe he could remain in his room or the hospital, or that he could terminate the encounter with the deputies or drive home rather than be forced to take a taxi. As a result,

plaintiff submitted to the deputies' authority and commands peacefully and without posing a risk of danger to anyone at all times during this encounter.

50.     Cain and Prasad knew or should have known that plaintiff did not commit a crime. They blindly followed Tornabene's directions rather than perform an adequate independent investigation to evaluate plaintiff's sobriety, particularly in light of his provable explanations regarding his denture and ankle. Cain and Prasad substituted Tornabene's judgment for their own. Had they followed department policy instead, they would have conducted an adequate investigation into plaintiff's sobriety. They would have independently attempted to develop probable cause. Had they done so, they would have determined that plaintiff was not under the influence of drugs or alcohol.

51.     Cain made an unlawful seizure of plaintiff. He knew about plaintiff's physical ailments and his particular susceptibility to physical pain. Plaintiff cooperated peacefully with Cain's commands and did not resist him or pose a risk of danger to anyone. Plaintiff told Cain in advance that he would press the start button to determine whether the keys were in the vehicle. Cain allowed him to do so. Therefore, when the vehicle started, Cain knew plaintiff was not attempting to flee. In any event, Cain lacked justification to detain or restrain plaintiff's movement in the parking lot even if his intent was to drive away. Moreover, Cain lacked justification to force plaintiff to take a taxi to his hotel.

52.     Cain intentionally used force in making a seizure of plaintiff. He used excessive force in making the seizure. Cain violated plaintiff's right under the Fourth Amendment to the Constitution to be free of excessive force during a seizure of his person. He proximately caused plaintiff to suffer extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder. Plaintiff also experienced fright, nervousness, grief, anxiety, worry, mortification, shock, terror, humiliation, embarrassment, apprehension, and indignity.

53.     After the assault, plaintiff suffered and continues to suffer anxiety about the possibility of going out in public for fear of being assaulted. He restricts himself to going to work and coming home. He suffers from loss of sleep and loss of enjoyment of life. As

a result, plaintiff prays for compensatory damages for pain and suffering and future pain and suffering against Cain in his personal capacity. Plaintiff also prays for punitive damages because Cain's use of force was oppressive, or it involved a callous disregard and reckless indifference to plaintiff's federally protected rights.

54.     Tornabene is liable for the seizure and use of force upon plaintiff because she acted in concert with the deputies. She intentionally provided them with false and misleading information, advice, assistance, and encouragement to cause them to unlawfully seize plaintiff. Tornabene procured and directed the deputies to seize plaintiff and force him into a taxi without their conducting an investigation or independently developing probable cause. Tornabene knew it was reasonably foreseeable that the deputies would deprive plaintiff of his rights and injure him under the circumstances. Her advice and assistance was a substantial factor in the seizure and use of force upon plaintiff. Had Tornabene merely asked the deputies for assistance rather than giving them instructions (which they followed), plaintiff would not have been subjected to the seizure and excessive force. As a result, plaintiff prays for compensatory and punitive damages against Tornabene in her personal capacity.

55.     Prasad, as Cain's supervisor, is liable for her own actions and personal involvement in the unlawful seizure on plaintiff. She knew or should have known that Tornabene's suspicion was too general and unsupported by adequate facts to confirm that plaintiff was under the influence. She substituted Tornabene's judgment for her own in contravention of department policy and the law. She permitted and directed Cain to substitute Tornabene's judgment for his own. She did not adequately perform an investigation into plaintiff's sobriety, particularly in light of his plausible explanations. She did not properly train and supervise Cain to perform an adequate investigation. She did not independently attempt to develop probable cause to determine whether plaintiff was under the influence. She continually rushed Cain to the extent that he took shortcuts, since she "needed to leave," and did not follow department policy and the law.

56.     Had Prasad and Cain performed an adequate investigation and attempted to develop probable cause rather than following Tornabene's directions, they would have

ascertained he was not under the influence.  As a result, Cain would not have had to escort plaintiff out of the building, force him into a taxi, or use force on him. Prasad had the authority to take steps to prevent the seizure but failed to do so.

57.     As a result, plaintiff is entitled to for compensatory and general damages against defendants.

58.     As a result of the actions of the defendants, plaintiff is entitled to punitive damages for the oppressive, outrageous, callous disregard, and reckless indifference to plaintiff's federally protected rights.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

### Second Cause of Action for Assault and Battery
### (Against Defendant Cain)

59.     Plaintiff incorporates by reference each and every allegation above as though fully set forth herein.

60.     Defendant Cain threatened to touch the plaintiff in a harmful or offensive manner  and did indeed assault plaintiff.  Plaintiff did not consent to the defendant's conduct. As a result of defendant's assault, plaintiff suffered extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder. Plaintiff also experienced fright, nervousness, grief, anxiety, worry, mortification, shock, terror, humiliation, embarrassment, apprehension, and indignity. A reasonable person in plaintiff's situation would have been offended by the touching.

61.     Cain made an unlawful seizure of plaintiff. He knew about plaintiff's physical ailments and his particular susceptibility to physical pain. Plaintiff cooperated peacefully with Cain's commands and did not resist him or pose a risk of danger to anyone. Plaintiff told Cain in advance that he would press the start button to determine whether the keys were in the vehicle. Cain allowed him to do so. Therefore, when the vehicle started, Cain knew plaintiff was not attempting to flee. In any event, Cain lacked justification to detain or restrain plaintiff's movement in the parking lot even if his intent was to drive away. Moreover, Cain lacked justification to force plaintiff to take a taxi to his hotel.

62.   **Assault**: Cain lunged at plaintiff with the intent to cause harmful or offensive contact with plaintiff. Plaintiff was put in imminent apprehension of the harmful or offensive contact. Plaintiff did not consent to the harmful contact. Plaintiff suffered harm. Cain's conduct was a substantial factor in causing plaintiff's harm.

63.   **Battery**: Cain lunged at plaintiff with the intent to cause a harmful and offensive contact on plaintiff. Cain intentionally used force that resulted in a harmful or offensive contact with plaintiff. Plaintiff did not consent to the contact. Cain's conduct was a substantial factor in causing plaintiff's harm. A reasonable person in plaintiff's position would have been offended by the contact.

64.   Cain's assault and battery proximately caused plaintiff to suffer extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder. Plaintiff also experienced fright, nervousness, grief, anxiety, worry, mortification, shock, terror, humiliation, embarrassment, apprehension, and indignity. After the incident, plaintiff suffered and continues to suffer anxiety about the possibility of going out in public for fear of being assaulted. He restricts himself to going to work and coming home. He suffers from loss of sleep and loss of enjoyment of life. As a result, plaintiff prays for compensatory damages for pain and suffering and future pain and suffering against Cain.

65.   As a result of Cain's behavior and acts, plaintiff is entitled to general and special damages upon proof by the trier of fact.

66.   Plaintiff is entitled to punitive damages under this cause of action because Cain's use of force was oppressive, and involved a reckless and callous indifference to plaintiff's rights, and he acted with fraud, malice, or oppression.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

### Third Claim for Intentional Infliction of Emotional Distress
### (Against Tornabene Cain, Prasad, and County of Contra Costa)

67.   Plaintiff incorporates by reference each and every allegation above as though fully set forth herein.

68.   Tornabene, Cain and Prasad knew or should have known plaintiff did not commit a crime. The defendants blindly followed defendant Tornabene's directions

rather than perform an adequate independent investigation to evaluate plaintiff's sobriety, particularly in light of his provable explanations regarding his denture and ankle. Had the defendants followed the policies and procedures in place removing doctors suspected of being under the influence, they would have conducted an adequate investigation into plaintiff's sobriety, and at least allow plaintiff to take an immediate drug test. They could have independently attempted to develop probable cause. Had they done so, they would have determined that plaintiff was not under the influence of drugs or alcohol.

69.     Cain made an unlawful seizure of plaintiff. He knew about plaintiff's physical ailments and his particular susceptibility to physical pain. Plaintiff cooperated peacefully with Cain's commands and did not resist him or pose a risk of danger to anyone. Plaintiff told Cain in advance that he would press the start button to determine whether the keys were in the vehicle. Cain allowed him to do so. Therefore, when the vehicle started, Cain knew plaintiff was not attempting to flee. In any event, Cain lacked justification to detain or restrain plaintiff's movement in the parking lot even if his intent was to drive away. Moreover, Cain lacked justification to force plaintiff to take a taxi to his hotel.

70.     Plaintiff suffered extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder. He also experienced severe emotional distress with symptoms of fright, nervousness, grief, anxiety, worry, mortification, shock, terror, humiliation, embarrassment, apprehension, and indignity. After the incident, plaintiff suffered and continues to suffer anxiety about the possibility of going out in public for fear of being assaulted. He restricts himself to going to work and coming home. He suffers from loss of sleep and loss of enjoyment of life.

71.     Prasad, as Cain's supervisor, is liable for her own actions and personal involvement in the unlawful seizure and assault on plaintiff. She knew or should have known that Tornabene's suspicion was too general and unsupported by adequate facts to confirm that plaintiff was under the influence and should be removed. She substituted Tornabene's judgment for her own in contravention of department policy and the law. As the lieutenant she did not adequately perform an investigation into plaintiff's sobriety,

particularly in light of his plausible explanations. She did not properly train and supervise Cain to perform an adequate investigation. She did not independently attempt to develop probable cause to determine whether plaintiff was under the influence. She continually rushed Cain to the extent that he took shortcuts and did not follow department policy and the law.

72.     Defendants' outrageous conduct was the actual and proximate cause of plaintiff's damages and injuries. As a result, plaintiff prays for general and special damages for medical expenses, pain and suffering and future pain and suffering against defendants.

73.     Cain assaulted plaintiff without justification and with knowledge of his susceptibility to pain. Cain committed extreme and outrageous conduct with the intent of causing, or reckless disregard of the probability of causing, emotional distress. His conduct is particularly more outrageous considering his position of authority as a law enforcement officer, and was so extreme as to exceed all bounds of that usually tolerated in a civilized community

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

### Fourth Cause of Action for Negligence
### (Against Defendants Cain and County of Contra Costa)

74.     Plaintiff incorporates by reference each and every allegation above as though fully set forth herein.

75.     Cain had a duty to plaintiff to exercise reasonable care under the circumstances. Cain breached that duty by assaulting him with the submission hold. Cain permitted plaintiff to sit in the car's driver's seat and push the start button in order to determine whether the keys were in the car. Plaintiff pushed the start button for that purpose, with Cain's knowledge and consent. Cain breached the duty when he assaulted plaintiff because he was not attempting to escape. The breach of duty was the legal or proximate cause of plaintiff's injuries.

76.     As a result of such breach, plaintiff suffered extreme physical pain throughout his hands, wrist, elbow, arm, and shoulder. He also experienced fright, nervousness, grief, anxiety, worry, mortification, shock, terror, humiliation, embarrassment, apprehension, and indignity. After the incident, plaintiff suffered and continues to suffer anxiety of going out in public for fear of being assaulted. He restricts himself to going to work and coming home. He suffers from loss of sleep and loss of enjoyment of life. Cain's outrageous conduct was the actual and proximate cause of plaintiff's emotional distress. As a result, plaintiff prays for compensatory damages for pain and suffering and future pain and suffering against Cain.

77.     The county is vicariously liable for the actions of Cain as its employee.

78.     As a result of the negligence of the defendants under this cause of action, plaintiff prays for general and special damages according to proof by the trier of fact.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

### Fifth Cause of Action for Defamation
### (Against Defendant County of Contra Costa)

79.     Plaintiff incorporates by reference each and every allegation above as though fully set forth herein.

80.     After the subject incidents as alleged herein, Contra Costa County hospital employee Tornabene handled the matter "administratively" pursuant to what she told the deputies when she advised them not to arrest plaintiff. She helped prepare the hospital's Business & Professions Code §805(b)(2)[1] report for physician misconduct which it submitted to the California Medical Board. Even though Tornabene told the deputies she suspected plaintiff of being under the influence of drugs or alcohol, the 805 report did not include an allegation that the hospital believed plaintiff was under the influence of drugs

---

[1] B&P §805(b)(2):  The use of, or prescribing for or administering to himself or herself, any controlled substance; or the use of any dangerous drug, as defined in Section 4022, or of alcoholic beverages, to the extent or in such a manner as to be dangerous or injurious to the licentiate, any other person, or the public, or to the extent that such use impairs the ability of the licentiate to practice safely."

or alcohol. Moreover, the words "drugs" or "alcohol" were never used in the report, which would indicate that Tornabene knew her accusation was false.

81.     The 805 report never mentioned that plaintiff asked for a drug test, or that Tornabene refused his request. It did not mention whether Tornabene asked plaintiff to take the test.

82.     The report stated that plaintiff's practice privileges were suspended for, among other things, "difficulty walking and talking…" However, Tornabene knew plaintiff had plausible explanations for those accusations. Moreover, she did not include plaintiff's explanations regarding his denture, ankle surgery, or psoriasis in the report.

83.     As part of his defense in the hospital's internal grievance proceedings, on April 2, 2018, plaintiff also submitted to the medical executive committee a copy of an x-ray showing the numerous screws and other hardware installed in his ankle.

84.     The 805 report also stated that plaintiff's privileges were suspended for "…acting inappropriately in front of patients by discussing plans for a trip with a phone interpreter." This irrelevant fact would not support the filing of an 805 report. The Contra Costa Regional Medical Center Medical Staff President, Taiyun Roe, M.D., also wrote a subsequent letter to the Medical Board stating that plaintiff "had difficulty walking and talking," even after the defendants clearly knew that he had dentures, screws in his ankle, and psoriasis.

85.     The hospital responds to inquiries from other health care providers regarding the status of certain physicians who worked there. In September 2018 a healthcare facility who was vetting plaintiff for prospective employment learned of the 805 report and contacted the hospital for an explanation. The hospital responded to the inquiry by issuing an Affiliation Verification dated September 19, 2018 which stated: "Review of the practitioner's file indicates that this practitioner is in good standing and there is no derogatory information recorded." This further indicates that defendants knew plaintiff was not under the influence on December 29th.  However, some months later, the plaintiff had a contract with a Modesto hospital, but it was summarily cancelled when they reviewed the 805 report.

86.    As a result of the above conduct by defendants, including the false content of the 805 report, plaintiff was wrongfully defamed by the publication of the statement to a third party, namely the California Medical Board.

87.    Defendants wrongfully attacked plaintiff's professional character.  Plaintiff had never in his career had any conduct or ethical issues prior to the false 805 report being made by the defendants.

88.    As a direct and proximate result of defendants' actions, plaintiff suffered loss of wages for at least six months.  Plaintiff is entitled to special damages according to proof.

89.    As a direct and proximate result of defendants' actions, plaintiff suffered general damages, including nervousness, grief, anxiety, worry, mortification, shock, humiliation, embarrassment, apprehension, and indignity.

90.    Plaintiff is entitled to punitive damages under this cause of action for defendants' intentional recklessness, outrageousness, disregard of the plaintiff's rights, and submitted  805 the report with ill will and with a high degree of knowing its falsity.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as set forth below.

**First Cause of Action**

1.    For special damages according to proof;

2.    For general damages according to proof;

**Second Cause of Action**

1.    For special damages according to proof;

2.    For general damages according to proof;

3.    For punitive damages as permitted by law and according to proof.

**Third Cause of Action**

1.    For special damages according to proof;

2.    For general damages according to proof;

3.    For punitive damages as permitted by law and according to proof.

**<u>Fourth Cause of Action</u>**

1.      For special damages according to proof;

2.      For general damages according to proof;

**<u>Fifth Cause of Action</u>**

1.      For special damages according to proof;

2.      For general damages according to proof;

3.      For punitive damages as permitted by law and according to proof.

Such other and further relief as the Court deems just and proper.

DATED:  November 22, 2019          LAW OFFICES OF JOHN E. COWAN


                                    /s/John E. Cowan

                          By_____
                                    JOHN E. COWAN
                                    Attorney for Plaintiff, Walter Walters