UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WALTER L. WALTERS,

Plaintiff,

v.

COUNTY OF CONTRA COSTA, et al.,

Defendants.

Case No.  19-cv-00702-DMR

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 86

Plaintiff Walter L. Walters filed a civil rights action claiming that he suffered constitutional violations in connection with his December 2017 removal from Contra Costa Regional Medical Center ("CCRMC"), where he had been working as a temporary physician. Defendants County of Contra Costa ("the County"), Deputy Sheriff Brian Cain, and Felicia I. Tornabene now move for partial summary judgment.  [Docket No. 86.]  The court held a hearing on September 10, 2020.  For the following reasons, Defendants' motion is granted.

I.      **REQUEST FOR JUDICIAL NOTICE**

Walters asks the court to take judicial notice of three documents pursuant to Federal Rule of Evidence 201.  [Docket No. 103.]  These documents include two reports CCRMC submitted about Walters to the Medical Board of California dated January 9, 2018 and February 6, 2018 (the "805 reports"); Cain's January 1, 2018 report of the incident at issue in this lawsuit; and CCRMC's 2015 Medical Staff Bylaws.  [Docket Nos. 97-4 (805 reports), 97-8 (Sheriff's Report), 97-12 (Bylaws).]

Under Rule 201, a court may take judicial notice of "an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  A fact is "not subject to reasonable dispute" if it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned." Fed. R. Evid. 201(b).  While Defendants do not object to Walters's request for judicial notice, Walters does not identify the facts he asks the court to judicially notice from the documents and does not explain how any such facts are "not subject to reasonable dispute."  The Ninth Circuit has instructed that if a court takes judicial notice of a document, it must identify the specific fact or facts it is noticing from the document.  *Khoja*, 899 F.3d at 999. To the extent that Walters seeks judicial notice of the existence of the two complaints submitted by CCRMC and the representations made in the complaints, as well as the existence of Cain's report and the representations made therein, the request is granted.  It is otherwise denied as to any assertions of fact within the documents.  *See id.*  The court also takes judicial notice of the existence of the CCRMC Medical Staff Bylaws.  The request for judicial notice is otherwise denied.

## II.   EVIDENTIARY OBJECTIONS

### A.   Walters's Objections to Defendants' Evidence[1]

#### 1.   Tornabene's Declaration

Walters objects to paragraph 11 of Tornabene's declaration, which refers to Walters's "impairment" and "the fact of his impairment."  [*See* Docket No. 108-1 (Tornabene Decl., Aug. 6, 2020) ¶ 11.]  According to Walters, Tornabene admits that her statements about Walters are based "on what she heard from others, not on her personal observation"; therefore, he argues, the statements are "inadmissible hearsay for the truth of the matters stated."  Opp'n 14.  He also argues that the statements about his alleged impairment contradict her own statement in her declaration that that to her knowledge, "[Walters] provided competent patient care during his time at CCRMC in 2017."  *Id.* (quoting Tornabene Decl. ¶ 16).

The objections are overruled.  Contrary to Walters's argument, Tornabene's statements about Walters's condition on the date in question, December 29, 2017, are not based solely on

---

[1] Walters also objected to the declarations of Tornabene, Cain, and Brandon Garry on the grounds that they did not contain the affirmation that the contents thereof are "true and correct."  Opp'n 14. The parties stipulated that Defendants could submit corrected versions of the declarations to address that omission, and Defendants timely filed the corrected declarations.  [Docket Nos. 108-1, 108-2, 108-3.]  The objection is therefore overruled.

United States District Court
Northern District of California

what she heard from others.  Tornabene explains that "[b]ased on [her] observations," Walters "appeared to be either physically or mentally impaired" on the date in question.  Tornabene Decl. ¶ 13.  Moreover, as to Tornabene's descriptions of others' observations of Walters, these descriptions are not offered for their truth, but are instead offered to show the effect on the listener, i.e., Tornabene's state of mind.  Therefore, they are not hearsay.  *See* Fed. R. Evid. 801(c) (defining hearsay as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement").  As to Walters's argument that Tornabene's statements are contradictory, this argument goes to the weight of Tornabene's statements, not their admissibility.

### 2.  Garry's Declaration

Walters also objects to statements in Lieutenant Brandon Garry's declaration.  Garry, a lieutenant with the Contra Costa County Sheriff's Office ("CCCSO"), states that he is the Training Manager for the CCCSO and that he is personally familiar with the written policies and procedures and customs and practices of the CCSO regarding deputy training.  [Docket No. 108-2 (Garry Decl., Aug. 4, 2020) ¶¶ 1-3.]  He describes the police academy training and pre-employment requirements for CCCSO deputies, as well as the required training during the probationary period and in-service, ongoing training.  *Id*. at ¶¶ 4-7.  Walters objects to the paragraphs regarding training as "largely inadmissible opinion or hearsay because he purports to know the actual training experiences of every Sheriff's deputy in Contra Costa County for all time and all places," but cites no data and instead attributes his knowledge to his familiarity with policies, procedures, customs, and practices.  Opp'n 14-15.

Defendants offer Garry's statements in support of their motion for summary judgment on Walters's *Monell* claim, to the extent that it is based on the County's failure to train CCCSO deputies.  As discussed below, Walters clarified in his opposition that he is not bringing a *Monell* claim based on an alleged failure to train.  Accordingly, Walters's objections to Garry's declaration are denied as moot.

### B.  Defendants' Objections to Evidence

#### 1.  Expert Declarations

Defendants object to the entire declaration of Arthur S. Shorr, M.D.  Reply 1.  Shorr states

3

United States District Court
Northern District of California

that he is an expert in "the administrative standards of care applicable to all hospitals in the United States," including CCRMC.  [Docket No. 97-11 (Shorr Decl., Aug. 2, 2020) ¶ 5.]  In his declaration, Shorr offers his opinion that Defendants' motion for summary judgment should be denied for several reasons, including that "[t]here are significant trier of fact issues that mitigate against granting" the motion.  *Id*. at ¶ 23.  Defendants argue that Walters did not timely disclose Dr. Shorr as an expert and that they learned of Dr. Shorr and his opinions for the first time in Walters's opposition brief which was filed on August 3, 2020, nearly six weeks after the close of expert discovery.  They argue that Walters should be precluded from offering his testimony pursuant to Federal Rule of Civil Procedure 37(c).

Additionally, two days before the hearing on this motion, Walters filed an administrative motion seeking leave to present the declaration of another expert, Dan Field, M.D., in support of his opposition to the motion for summary judgment.  [Docket No. 114.]  Defendants filed an opposition, again arguing that Walters did not disclose the expert by the expert disclosure deadline.  [Docket No. 115.]

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  In turn, Rule 26(a)(2) provides that a party must disclose the identity of any expert witness it may use at trial and that any such disclosure must be accompanied by a written report setting forth a complete statement of the expert's opinions.  Fed. R. Civ. P. 26(a)(2)(A), (B).  In this case, the expert disclosure deadline was May 26, 2020, and expert discovery closed on June 23, 2020.  [Docket No. 49.]  At the hearing, Walters's counsel explained that the late disclosures occurred because he did not realize that Defendants would be filing a summary judgment motion. This is factually incorrect, as Defendants have signaled since the inception of this case that such a motion would be forthcoming.  [*See* Docket No. 42 (Parties' Initial Joint Case Management Statement) 6 ("Defendants anticipate filing a motion for summary judgment.").]  In any event, Plaintiff's proffered reason is not substantially justified, and the late expert disclosures in the middle of and even after summary judgment briefing are not harmless.  Accordingly, Defendants'

4

United States District Court
Northern District of California

1   objection to Dr. Shorr's declaration is sustained and Walters's administrative motion for leave to

2   present Dr. Field's declaration is denied.  Walters is precluded from offering their opinions in

3   connection with this motion or at trial.

4                    **2.      Statements Attributed to Tornabene**

5          Defendants next object to certain statements in Walters's declaration that he attributes to

6   Tornabene.  In Walters's declaration, he states that an unnamed person in his staffing agency told

7   him "that Tornabene told Dr. Saadi that she . . . offered me a drug test and that I declined to take

8   it."  He also states that at an April 2, 2018 Medical Executive Committee ("MEC") meeting, an

9   unidentified "female MEC member states . . . that Tornabene told the MEC that Tornabene asked

10  me to take a drug test and I had refused . . ."  [Docket No. 97-2 (Walters Decl., Aug. 1, 2020) ¶¶

11  64, 65.]

12         Defendants also object to Exhibits E and F to Walters's declaration.  Walters states that

13  Exhibit E contains "relevant excerpts from the minutes of" the April 2, 2018 MEC meeting and

14  Exhibit F is a "true and correct transcript" he obtained of that meeting.  Walters Decl. ¶¶ 63, 65,

15  Exs. E, F.  According to Walters, Exhibit F contains a statement that Tornabene said that "they

16  wanted [Walters] . . . to get treatment and testing in the ER."  Walters Decl. ¶ 65, Ex. F at 26.

17         Defendants object to this evidence as hearsay.  As noted, hearsay is a statement that "a

18  party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid.

19  802(c).  Walters cites this evidence in his opposition to argue that "Tornabene falsely claimed that

20  she offered Plaintiff a drug test but Plaintiff refused to take it."  Opp'n 10.  Therefore, Walters is

21  relying on this evidence to prove the truth of the matter, that is, that Tornabene said she offered

22  Walters a drug test, which he refused.  The statements are hearsay and therefore inadmissible.

23                    **3.      Statement About Hospital Protocol**

24         Finally, Defendants object to the statement in Walters's declaration that "[t]he hospital

25  protocol during this incident required it to test me for substance abuse."  *See* Walters Decl. ¶ 43.

26  Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is

27  introduced sufficient to support a finding that the witness has personal knowledge of the matter."

28  Here, Walters does not set forth any foundation for his statement, other than saying generally that

5

he is "aware that hospitals have a protocol requiring the testing for substance abuse of any physician suspected of being under the influence while on duty."  Walters Decl. ¶ 43.  This is insufficient, as he does not establish the existence of any such protocol at CCRMC or any other facts supporting his statement.  Accordingly, the objection is sustained.

## III.   BACKGROUND

### A.  Factual Background

The following facts are undisputed, unless otherwise noted.

Walters, who is African American, is a board-certified anesthesiologist.  [Docket No. 97-2 (Walters Decl., Aug. 1, 2020) ¶¶ 4, 6.]  In October 2017, he accepted a two-month placement from a staffing company as a temporary or "locum tenens" anesthesiologist at Contra Costa Regional Medical Center ("CCRMC"), a County hospital.    [Docket No. 97 (Cowan Decl., Aug. 3, 2020) ¶ 3, Ex. A (Walters Dep.) Ex. 1.]  The assignment ran from November 1, 2017 through December 29, 2017.  *See id.*

At the time he began working at CCRMC, Walters was experiencing a number of symptoms related to his medical conditions.  These conditions include rheumatoid arthritis, which causes swelling, pain, and sensitivity in his ankles, wrists, and hands.  He walked with "an unusual gait/limp" following ankle surgery which required the installation of metal screws.  Walters wears dentures "which sometimes cause [his] speech to be less clear than otherwise" and he has a diagnosed speech impediment.  Additionally, he has inflammatory bowel disease ("IBD"), which causes intermittent bouts of diarrhea and dehydration.  Walters Decl. ¶ 12.  Being on his feet for long periods of time tires Walters and aggravates his rheumatoid arthritis and ankle pain.  *Id.* at ¶ 13.

Walters states he agreed to work eight-hour shifts for at least the first month of his assignment, but that after starting at CCRMC he learned that the hospital did not offer that schedule.  Walters Decl. ¶ 10.  After working two 12-hour shifts in his first week, he spoke with Defendant Tornabene, the then-Hospital Medical Director of CCRMC, about his medical conditions.  *Id.* at ¶ 14.  As Medical Director, Tornabene's responsibilities included supervising the medical personnel at CCRMC, including temporary physicians such as Walters.  [Docket No.

108-1 (Tornabene Decl., Aug. 6, 2020) ¶ 2.]  Walters explained to her that "the rheumatoid arthritis, IBD, compromised ankle, and psoriasis made it exceedingly wearying for [him] to work shifts of more than 8 hours at a time," and that he "would be 'walking funny' if [he] worked all of those hours."  Walters Decl. ¶ 14.  According to Walters, Tornabene "apologized and promised to try to resolve the problem."  *Id.*

On December 29, 2017, Walters's final day at CCRMC, Walters was scheduled to work from 7:00 a.m. until 7:00 p.m.  On the previous day he worked a 24-hour shift.  Although his last case on December 28, 2017 was at 10:00 p.m., he remained on call throughout the night.  Walters Dep. 102-03; Walters Decl. ¶ 26.  At approximately 3:00 p.m. on December 29, 2017, Walters went to the "call room" on the Labor & Delivery floor to rest after a procedure.  Walters Decl. ¶ 26.  A call room is a private room with a bed that is available for doctors' use to rest or sleep while they are working and not treating patients.  Tornabene Decl. ¶ 7.  Walters had used the room on several occasions to sleep or rest while on call.  Walters Decl. ¶ 15.  That afternoon, before going to sleep in the call room, Walters removed his dentures and removed his pants due to his psoriasis and pruritis.  *Id.* at ¶ 16, 38.  At some point Walters was awakened by a knock on the call room door.  According to Walters, when he opened the door, "a nurse manager . . . asked if [he] was ok."  *Id.* at ¶ 26.  He told her that he had been on call the night before "and was resting" and "[s]he said, ok and then left."  *Id.*

At approximately 4:00 p.m., Cita Richeson, a nurse manager at CCRMC, contacted Tornabene by phone.  Tornabene, who was not at the hospital, also spoke with Dr. Judith Bliss, the chair of the Obstetrics and Gynecology Department.  Tornabene Decl. ¶ 3.  Tornabene states that Richeson and Bliss informed her that Walters "appeared to be mentally and/or physically impaired at work," and that they "were concerned about his ability to provide safe and competent patient care."  *Id.*  Tornabene then spoke with Jeanette Black, the Director of Inpatient Nursing at CCRMC.  Black informed Tornabene that she "contacted Dr. Walters in person in the presence of" Defendant Cain, and that "Dr. Walters did not appear 'right' in terms of his manner or appearance."  *Id.* at ¶ 4.  Cain is a deputy sheriff with the Contra Costa County Sheriff's Office. In December 2017, he was assigned to the Health Services Security Unit and worked primarily at

1    CCRMC.  [Docket No. 108-3 (Cain Decl., Aug. 6, 2020) ¶ 2.]  His duties included providing

2    security for CCRMC staff and patients.  Cain Decl. ¶ 4.

3            After speaking with Richeson, Bliss, and Black by phone, Tornabene drove to CCRMC.

4    When she arrived, she spoke with Bliss, Black, and two nurses who had interacted with Walters

5    that day.  They told her the following about Walters:

6                    a.   he appeared to have difficulty completing an epidural procedure;

7                    b.   one of his patients complained to a nurse that he was "acting funny" and appeared

8                         to be "drunk";

9                    c.   he was slow to respond to pages from the nurses;

10                   d.   he was slurring his words;

11                   e.   he confused one medication with another;

12                   f.   he brought food into a patient's room and left it on the anesthesia cart;

13                   g.   he had tape residue on his inner arm and a visible puncture mark, and when asked

14                        about it, responded that he was "attacked by a Christmas tree"; and

15                   h.   he dropped a pair of underwear at the nurses' station.

16   Tornabene Decl. ¶ 6.[2]  She then went to the call room where Walters was resting, accompanied by

17   Bliss, Cain, and Cain's supervisor Angela Prasad.  *Id*. at ¶ 7.

18           Cain states that at some point on December 29, 2017, he was "contacted by someone who

19   worked in management at CCRMC asking [him] to act as 'security stand by' while the hospital

20   relieved a doctor . . . who they suspected might be under the influence of drugs or alcohol."  *Id*. at

21   ¶ 3.  He does not recall who contacted him.  *Id*.  According to Cain, his role was "to provide

22   security for hospital management for a personnel matter."  *Id*. at ¶ 4.

23           Tornabene knocked on the door of the call room.  Walters opened the door as he was lying

24   in bed, and Tornabene could see that he was naked from the waist down.  Tornabene Decl. ¶¶ 7, 8.

25   Cain then asked Walters to step outside.  *Id*. at ¶ 9.  Walters testified that when he saw Cain, he

26

27   _____

     [2] At his deposition, Walters did not dispute that on December 29, 2017 his speech was slurred, he
28   dropped a pair of underwear at the nurses' station, an observer could have concluded that he was
     having trouble walking, and that he told a nurse he had been attacked by a Christmas tree.  Walters
     Dep. 111, 122-23, 140.

United States District Court
Northern District of California

United States District Court
Northern District of California

thought, "[t]hey think I'm on drugs," and so told him, "I don't do drugs."  Walters Dep. 129, 131.

He then told Cain that he would come out as soon as he was dressed and closed the door.  Walters

Decl. ¶ 30; Walters Dep. 131-32.  After a minute or two, as Walters was finishing getting dressed,

Cain banged on the door, entered the room, and in a "very aggressive" manner shouted at Walters,

"[c]ome on, let's go!"  *Id*. at 132-33, 146; Walters Decl. ¶ 31.  Walters states that he was "so

terrified of being shot or assaulted" that he offered to let Cain stay in the room while he dressed.

Cain declined and went back into the hallway.  Walters Decl. ¶ 31; Walters Dep. 133-34.  After

getting dressed, Walters came into the hallway where Tornabene, Cain, Prasad, two nurses, and an

unidentified uniformed officer were standing.  *Id*. at 135.  According to Walters, Tornabene told

him that he was being relieved because he looked like he was having difficulty walking and had

slurred speech.  *Id*. at 137.  She also told him that "[his] services were no longer needed," that he

was not allowed to drive himself home, and that the hospital would pay for him to take a taxi

home.  Walters Decl. ¶ 36.

When she finished speaking, Walters pulled up his pants leg and "showed them the

psoriatic arthritis" and his swollen hands and wrist and pulled out his denture to show to her.

Walters Dep. 138; Walters Decl. ¶¶ 38, 39.  He also explained that he has screws in his right ankle

from surgery and showed them his surgery scar, and informed them that the pain in his ankle

causes him to limp when he has to walk or stand for long periods.  Walters Decl. ¶ 39.  Walters

told Tornabene that he did not need a taxi because he had a car at the hospital, but Tornabene did

not respond.  *Id*. at 162-63.  Walters testified that he then told Tornabene, "[i]f you're going to go

this route, . . . let's go to the [emergency room], get me a drug test, and then I will sue."  *Id*. at

138, 141, 143; Walters Decl. ¶ 42.  According to Walters, he continued to state that he was not

under the influence of drugs but Tornabene ignored him and "walked off."  Walters Dep. 143-44;

Walters Decl. ¶ 42.

Tornabene states that when Walters first came into the hallway, he "appeared to have

difficulty walking initially."  Tornabene Decl. ¶ 9.  She informed Walters that "based on

observations of his behavior and demeanor, staff members were concerned about his well-being

and that he did not appear to be able to continue working."  Walters responded that "he was not on

United States District Court
Northern District of California

drugs or alcohol," and "[that he was] tired from working long hours, in pain because of rheumatoid arthritis, and slurring his speech because of dentures." *Id.* at ¶ 10. According to Tornabene, the reasons for Walters's alleged impairment "were not important to me at that time"; she states that her "primary goal was removing him from the hospital to protect patients because, based on the information [she] received, [she] did not believe he was capable of safely caring for his patients." *Id.* at ¶ 11. She states that she was also concerned about his ability to safely drive himself home. *Id.* Despite this, she did not believe that he was "gravely disabled or unable to care for himself," and so did not believe that there were grounds to force him to seek medical or mental health care. *Id.* at ¶ 13. According to Tornabene, she did not accuse Walters of being under the influence of drugs or alcohol. *Id.* at ¶ 12.

Cain then accompanied Walters to the locker room where he changed out of his scrubs and into his clothes. Walters was unable to find his keys or cell phone and the two returned to the call room together so that he could look for them. While together in the call room, Walters asked Cain to assist him in looking through his bag for his keys and phone so that Cain could see "that there was no drug paraphernalia" in the bag. Walters Dep. 144-47. After failing to find his keys and phone, Walters then took the elevator with Cain and the other uniformed officer to the lobby of the hospital and walked outside to look in his car. Cain followed him to his car. *Id.* at 148-49. Once they reached the car, Walters and Cain searched for Walters's keys. According to Walters, he told Cain that he was going to sit in the driver's seat and press the button to start the engine; if the car started, explained Walters, they would know that the key was in the car. *Id.* at 151. Cain walked over to the driver's side door and watched Walters press the button. Walters testified that the car started, and Cain "grabbed [him] by [his] wrist," twisted it, and performed a "martial arts maneuver[ ]." *Id.* at 152, 153-54. Walters screamed in pain, tried to extract himself from the hold, and Cain accused him of trying to flee. *Id.* at 153, 156. Cain then pulled him out of the car and released his hold on Walters. *Id.* at 157. After Cain located the car key under the driver's seat, Walters and Cain walked back to the lobby. *Id.* at 158.

Walters then waited with Cain, Prasad, and the other uniformed officer in the lobby for the taxi. Walters asked them, "[h]ow are you going to put me in a taxicab without a Breathalyzer, a

10

1    drug test, or a sobriety test?"  No one responded, and Walters informed them that he was being

2    kidnapped.  Walters Dep. 159; Walters Decl. ¶ 46.  According to Walters, none of the officers

3    took any steps "to investigate Tornabene's statements about [him]" or asked him whether he had

4    consumed any drugs or alcohol that day.  Walters Decl. ¶ 46.

5        Cain states that he did not take any steps to determine whether Walters was under the

6    influence of drugs or alcohol because he "was not investigating potential criminal conduct" by

7    Walters.  Cain Decl. ¶ 7.  According to Cain, Walters appeared to be "mentally and/or physically

8    impaired" and did not appear to be able to safely drive a car.  *Id*. at ¶ 5.  Cain also states that he

9    did not make the decision to send Walters home in a taxi but that he agreed with that decision

10   based on his interaction with Walters.  Cain Decl. ¶ 5.

11       A taxi arrived and Walters got into the taxi by himself.  He testified that he understood

12   from the officers' body language that "they would physically put [him] in the taxi if [he] refused

13   to get in."  The driver then drove him to his hotel.  Walters Dep. 161-62; Walters Decl. ¶ 59.

14   Once there, a friend drove him back to the hospital where he retrieved his car and drove himself

15   home.  Walters Dep. 163.

16       Later that evening, Walters took a home drug test, which was negative.  *Id*. at 189-91.  On

17   January 25, 2018, Walters had his urine and a hair follicle tested.  The test, which detects drug use

18   as far back as 90 days before the test, came back negative.  Walters Decl. ¶ 62.

19       On January 9, 2018, Tornabene submitted a Health Facility/Peer Review Reporting Form

20   ("805 Report") to the Medical Board of California stating that Walters's employment had been

21   terminated or revoked.  In an attachment she wrote, "On 12/29/2017 the subject was exhibiting

22   concerning behaviors."  Walters Decl. ¶ 61, Ex. D.  In a supplemental 805 Report dated February

23   6, 2018, a CCRMC representative, Taiyun Roe, M.D., wrote that "[m]ultiple witnesses observed

24   Dr. Walters to be acting in an unusual way that suggested he was mentally and physically

25   incapable of providing safe care."  Roe provided the following details:

26           [Walters] had difficulty walking and talking, had trouble responding
             in an appropriate fashion, seemed unaware of aspects of his
27           surrounding[s] (such as being half-naked or having underwear at his
             feet), acted inappropriately in front of patients (e.g. discussed plans
28           for a trip with a phone interpreter), and was slow to respond.

United States District Court
Northern District of California

Walters Decl. Ex. D.

> **B.    Procedural History**

Walters filed a complaint against the County, Cain, Tornabene, and Prasad in February 2019 and later filed first and second amended complaints.  [Docket Nos. 17, 28.]  On October 15, 2019, the court granted in part and denied in part Defendants' motion to dismiss the second amended complaint ("SAC").  *Walters v. Cnty. of Contra Costa*, No. 19-cv-00702-DMR, 2019 WL 5191099 (N.D. Cal. Oct. 15, 2019).  In relevant part, the court concluded that Defendants were entitled to qualified immunity on Walters's claim that the order by Cain and Prasad to leave the hospital, unaccompanied by force, constituted an unlawful seizure within the meaning of the Fourth Amendment.  *Id.* at *6-8.  The court thus dismissed the claim.  *See id.*  The court also denied Defendants' motion to dismiss Walters's claim that requiring him to depart the hospital in a taxi without justification violated the Fourth Amendment on the basis of qualified immunity, holding that the denial was "without prejudice to Defendants' renewing the defense on a full record at summary judgment."  *Id.* at *9.

In February 2020, the parties stipulated to dismiss all claims against Prasad.  [Docket No. 73.]

Walters alleges the following claims in the fifth amended complaint ("5AC"), which is the operative complaint: a 42 U.S.C. § 1983 claim for unreasonable seizure in violation of the Fourth Amendment, based on Cain ordering Walters to leave the hospital, restraining Walters's movement in the parking lot, forcing him to take a taxi to his hotel, and excessive use of force, against Cain and the County; 2) assault and battery against Cain; 3) negligent infliction of emotional distress against Tornabene, Cain, and the County; 4) negligence against Cain and the County; and 5) defamation against Tornabene and the County.  [Docket No. 71.]

Defendants now move for summary judgment on all claims except Walters's claims for excessive force and assault and battery against Cain.  [Docket No. 86.]

## IV.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

United States District Court
Northern District of California

of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

## V.    DISCUSSION

### A.  Section 1983 Claims

#### 1.  Claims Against the County

Walters brings a 42 U.S.C. § 1983 claim for unreasonable seizure in violation of the Fourth Amendment against the County. He alleges that "[t]he County of Contra Costa had a duty to train and supervise their law enforcement personnel to follow the policies and procedures put in place with regard to individuals who are suspected of being intoxicated by either alcohol or drugs." 5AC ¶ 51.

Defendants argue that the claim fails as a matter of law because Walters cannot establish a claim for municipal liability pursuant to *Monell v. Department of Social Services of City of New*

United States District Court
Northern District of California

1    *York*, 436 U.S. 658 (1978), based upon a single alleged constitutional violation.  *See Christie v.*

2    *Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("A single constitutional deprivation ordinarily is

3    insufficient to establish a longstanding practice or custom.").  It also argues that the County

4    adequately trains and supervises its duties.  *See* Garry Decl. ¶¶ 4-7.

5          In response, Walters clarifies that his claim against the County is not based on its alleged

6    failure to train.  Opp'n 12.  Instead, he asserts his claim against the County is based on Cain's

7    alleged "fail[ure] to follow County policies and procedures to determine whether [Walters] was

8    under the influence . . ."  *Id.*  At the hearing, Walters's counsel confirmed that this claim (as well

9    as the negligent infliction of emotional distress claim, discussed below) seeks to hold the County

10   liable for Cain's actions on a theory of respondeat superior.  *See id*. at 18 (arguing that Cain's

11   actions are "attributable to [the County]").

12         A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of

13   rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S.

14   51, 60 (2011) (quoting *Monell*, 436 U.S. at 692).  However, the municipality may be held liable

15   "only for '[its] *own* illegal acts.'"  *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

16   It cannot be held vicariously liable for its employees' actions.  *Id.* (citations omitted).  To establish

17   municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused

18   their injury."  *Id.* (quoting *Monell*, 436 U.S. at 691).  "The 'official policy' requirement was

19   intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and

20   thereby make clear that municipal liability is limited to action for which the municipality is

21   actually responsible."  *Pembaur*, 475 U.S. at 479-80.  Official municipal policy includes "the

22   decisions of a government's lawmakers, the acts of its policymaking officials, and practices so

23   persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S. at 61

24   (citations omitted).  Such policy or practice must be a "moving force behind a violation of

25   constitutional rights."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing

26   *Monell*, 436 U.S. at 694).

27         In this case, Walters seeks a finding of liability against the County based on Cain's own

28   actions during the incident, but as explained above, a municipality cannot be held vicariously

1   liable under section 1983 for its employees' actions.  *Connick*, 563 U.S. at 60.  Accordingly,

2   summary judgment is granted as to Walters's section 1983 claim against the County.

3         **2.**     **Claims Against Cain**

4        Walters's section 1983 claims against Cain are based on three individual violations of the

5   Fourth Amendment: 1) forcing Walters to leave the hospital; 2) using force against Walters in his

6   car; and 3) forcing Walters to depart the hospital in a taxi instead of in his own car.  5AC ¶¶ 49,

7   52-53; Opp'n 15.  As noted, Defendants do not seek summary judgment on Walters's claim that

8   Cain used excessive force on Walters when they were in Walters's car.  Therefore, only the first

9   and third violations are at issue in this motion.

10       As to the first, Defendants argue that forcing Walters to leave the hospital was not a

11  seizure within the meaning of the Fourth Amendment, and that even if it was, Cain is entitled to

12  qualified immunity on the claim because it would not have been clear to a reasonable officer that

13  such conduct was unlawful.  Mot. 8-9.  The court has already dismissed this claim.  In its October

14  15, 2019 order granting in part Defendants' motion to dismiss the second amended complaint, the

15  court found that Defendants were entitled to qualified immunity on Walters's claim that the order

16  by Cain and Prasad to leave the hospital, unaccompanied by force, constituted an unlawful seizure

17  within the meaning of the Fourth Amendment.  *Walters*, 2019 WL 5191099, at *6-8.  As pleaded

18  in the 5AC, which is the operative complaint, the Fourth Amendment claim against Cain is

19  substantially the same as it was pleaded in the second amended complaint.  *See* 5AC ¶¶ 49-50, 52-

20  55.  Therefore, Walters's Fourth Amendment claim based on Cain's participation in Tornabene's

21  order to leave the hospital has already been dismissed.

22       As to the third violation, which alleges that Cain unlawfully forced Walters to depart the

23  hospital in a taxi, Defendants move for summary judgment on the ground that Cain is entitled to

24  qualified immunity.

25       Section 1983 creates a civil cause of action against a "person who, under color of any

26  statute, ordinance, regulation, custom, or usage, of any State" deprives another person of any of

27  their "rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

28  To state a claim under section 1983, a plaintiff must allege two essential elements: (1) that a right

United States District Court
Northern District of California

secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ketchum v. Alameda Cnty.*, 811 F.2d 1243, 1245 (9th Cir. 1987).

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotation omitted; emphasis removed); *see also United States v. Smith*, 633 F.3d 889, 892 (9th Cir. 2011) (holding that "a person is not 'seized' within the meaning of the Fourth Amendment unless "by means of physical force or show of authority, his freedom of movement is restrained.'" (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)).  "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).  Under *Terry* and its progeny, a temporary seizure is reasonable under the Fourth Amendment if law enforcement officers have "reasonable suspicion"—that is, "articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer*, 460 U.S. 491, 498 (1983).

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Moss v. U.S. Secret Serv.*, 675 F.3d 1213, 1222 (9th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The qualified immunity analysis involves two inquiries.  First, taken in the light most favorable to the plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id.*  If, however, "a violation

16

1   could be made out on a favorable view of the parties' submissions," the court must examine

2   "whether the [constitutional] right was clearly established." *Id*.  The court may exercise its

3   discretion in deciding "which of the two prongs of the qualified immunity analysis should be

4   addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*,

5   555 U.S. 223, 236 (2009).

6        "The linchpin of qualified immunity is the reasonableness of the official's conduct."

7   *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1075 (9th Cir. 2011) (citation omitted).  "The

8   relevant, dispositive inquiry in determining whether a right is clearly established is whether it

9   would be clear to a reasonable officer that his conduct was unlawful in the situation he

10  confronted." *Saucier*, 533 U.S. at 202.  "If the law did not put the officer on notice that his

11  conduct would be clearly unlawful, summary judgment based on qualified immunity is

12  appropriate." *Id*.  "A clearly established right is one that is 'sufficiently clear that every

13  reasonable official would have understood that what he is doing violates that right.'" *Mullenix v.*

14  *Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664

15  (2012)).  The Supreme Court has cautioned that specificity in determining whether "the violative

16  nature of *particular* conduct is clearly established . . . is especially important in the Fourth

17  Amendment context, where the Court has recognized that it is sometimes difficult for an officer to

18  determine how the relevant legal doctrine . . . will apply to the factual situation the officer

19  confronts." *Mullenix*, 136 S. Ct. at 308 (emphasis in original; quotation omitted).  A court

20  determining whether a right was clearly established looks to "Supreme Court and Ninth Circuit

21  law existing at the time of the alleged act." *Community House, Inc. v. Bieter*, 623 F.3d 945, 967

22  (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)).  Finally, "[i]t is the

23  plaintiff who bears the burden of showing that the rights allegedly violated were clearly

24  established." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal

25  quotation marks and citation omitted).

26       Here, Defendants contend that Cain is entitled to qualified immunity, arguing that it would

27  not have been clear to a reasonable officer that "ensuring that a person showing signs of

28  impairment did not drive himself from the hospital was an unreasonable seizure in violation of the

Fourth Amendment." Mot. 10. They argue that they have been unable to locate any controlling authority that a law enforcement officer "violates the Fourth Amendment by participating in the decision by hospital administration to order a physician who appears impaired not to drive himself home." *Id.*

Here, Cain states that an unidentified management person at CCRMC called and asked him to act as "security stand by" while the hospital "relieved" a doctor suspected of being under the influence of drugs or alcohol. Cain Decl. ¶ 3. According to Cain, Walters appeared to be "mentally and/or physically impaired" and did not appear to be able to safely drive. *Id.* at ¶ 5. Cain states that although he did not make the decision to send Walters away in a taxi, he agreed with that decision based on his interaction with Walters. Cain also states that he "did not take any steps to determine whether Dr. Walters was under the influence of drugs or alcohol because [he] was not investigating potential criminal conduct by Dr. Walters." *Id.* at ¶¶ 5, 7.

Without reaching the question of whether Cain's conduct in forcing Walters to take a taxi violated Walters's Fourth Amendment rights, the court concludes that Walters cannot establish the second inquiry for the qualified immunity analysis. Specifically, Walters does not identify any authority that a reasonable officer who was not investigating potential criminal conduct but was instead summoned to act as "security stand by" to enforce an order to take a taxi from the hospital would have understood that by doing so, he was effectuating a seizure that must be supported by reasonable suspicion. Importantly, Walters did not depose Cain or any other witnesses, and he does not challenge Cain's statements about the role he was playing during this incident in any way. Specifically, he offers no evidence or argument about Cain's training, experience, or history at CCRMC, and does not dispute Cain's statement that he was not investigating criminal conduct at the time he enforced Tornabene's order to depart the hospital in a taxi. He also does not dispute Cain's assertion that he was essentially acting as a security guard for the hospital.

When asked to provide authority that would have put Cain on notice that his actions constituted an unlawful seizure, Walters's counsel identified only Cain's training in general. This is insufficient. At the time of the incident, there was no published Supreme Court or Ninth Circuit law that addressed whether an officer's enforcement of an order for an individual to leave a

18

hospital in a taxi due to a suspected impairment must be supported by reasonable suspicion that a crime had been or was about to be committed. Accordingly, Cain is entitled to qualified immunity on Walters's Fourth Amendment claim based on the order to depart in a taxi. Summary judgment is therefore granted on that claim.

### B.    Negligence Claims

Walters's third claim is negligent infliction of emotional distress against Tornabene, Cain, and the County. His fourth claim is negligence against Cain and the County. In their motion, Defendants argue that the third claim is duplicative of the fourth claim and should be dismissed. In response, Walters contends that the claims are distinct. According to Walters, the third claim for negligent infliction of emotional distress is based on the allegations that Tornabene and Cain "failed to perform an investigation which would have prevented" his injury. Opp'n 19; *see* 5AC ¶ 67. At the hearing, Walters's counsel also clarified that his negligent infliction of emotional distress claim against the County is based on a theory of vicarious liability for Tornabene and Cain's actions. The fourth claim for negligence is based on Cain's alleged assault on Walters. Opp'n 19; 5AC ¶¶ 74-76. On reply, Defendants appear to withdraw their motion as to the claim for negligence based on Cain's use of force. *See* Reply 5-8 (discussing only the third claim).

Defendants move for summary judgment on the negligent infliction of emotional distress claim based on the failure to perform an investigation into Walters's sobriety on two bases: first, they argue that the claim is barred as to Tornabene because Walters failed to comply with the California Tort Claims Act. They also argue that the claim otherwise fails on the merits.

### 1.    Compliance with the California Tort Claims Act

"The California Tort Claims Act requires anyone suing a public entity to first file a claim with the entity that includes a 'general description' of the alleged injury 'so far as it may be known at the time of presentation of the claim.'" *K.T. v. Pittsburg Unified Sch. Dist.*, 219 F. Supp. 3d 970, 981 (N.D. Cal. 2016) (quoting Cal. Gov't Code §§ 910, 945.4); *see also Robinson v. Alameda Cty.*, 875 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012). "The purpose of [the California Tort Claims Act] is 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'" *Stockett v. Ass'n of*

United States District Court
Northern District of California

*Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 446 (2004) (quoting *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 455 (1974)).  "Consequently, a claim need not contain the detail and specificity required of a pleading, but need only fairly describe what [the] entity is alleged to have done."  *Stockett*, 34 Cal. 4th at 446 (citation and internal quotation marks omitted); *see also Blair v. Sup. Court*, 218 Cal. App. 3d 221, 224 (1990) ("As long as these general elements are present, it is not necessary that the claim comply with formal pleading standards.").  The requirements of the California Tort Claims Act apply to suits against public *employees* as well as to public entities.  *Massa v. S. Cal. Rapid Transit Dist.*, 43 Cal. App. 4th 1217, 1222-23.

Pursuant to Government Code section 910, a claim must contain, among other information, (1) "the date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" (2) "[a] general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim" and (3) "[t]he name or names of the public employee or employees causing the injury, damage, or loss, if known."  Cal. Gov't Code § 910.

Walters filed a tort claim with the County on June 26, 2018.  [Docket No. 87 (Hurley Decl., July 8, 2020) ¶ 5, Ex. F (Tort Claim).]  It states that Walters's claim for monetary damages is "against [CCRMC] and its police officer/private security guard (his name and specific position is unknown at this time), pursuant to the California Government Claims Act . . ."  Tort Claim 1.  The tort claim describes the incident at issue, including "hospital staff" telling him "they were sending him home before the end of his shift" and calling three police officers or security guards "to remove him from the premises and put him in a taxi."  *Id*. at 2.  It also states that despite his medical conditions "explain[ing] away their observation of perceived unusual behavior, the staff and officers/guards still insisted that Dr. Walters leave the premises," and that "[t]he staff declined his request to take a drug test to remove any suspicions about his behavior."  *Id*.  The tort claim also describes Walters's search with an "officer/guard" in his car for his car keys, the subsequent martial arts submission hold, and Walters's trip home in a taxi.  *Id*. at 2.

The tort claim indicates that Walters intended to bring a lawsuit asserting claims "including, but not limited to," assault, battery, and violation of the California Constitution based

on the actions of the "officer/guard."  Under the heading "Name of the Public Employee Causing the Injury or Damage," Walters wrote, "[t]he name of the police officer/private security guard who committed the assault and battery upon Dr. Walters is currently unknown.  He will be identified during discovery."  *Id.* at 3.

According to Defendants, Walters's failure to identify Tornabene by name or assert any intention to bring claims against her in his tort claim bars his negligence claim against Tornabene. The court disagrees.  The California Tort Claims Act "is designed 'to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions.'" *K.T.*, 219 F. Supp. 3d at 981 (quoting *Stockett*, 34 Cal. 4th at 446).  "The statutory bar therefore applies only to a 'complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons." *Id.* (quoting *Stockett*, 34 Cal. 4th at 446).  Here, Walters wrote in his tort claim that "hospital staff told him they were sending him home" and "called three police officers," and that "the staff and officers/guards still insisted" he leave the premises.  He further wrote that "[hospital] staff declined his request to take a drug test to remove any suspicions about his behavior."  Tort Claim 2.  These are the actions that caused Walters's claimed harm: in his general description of the injury or damage, Walters wrote that "[p]ursuant to the hospital staff's directions to restrain Dr. Walters, restrict his freedom, and eject him from the hospital, the officer/guard caused Dr. Walters to suffer extreme physical pain from the battery . . ."  *Id.* at 3.  Defendants do not explain how Walters's failure to identify Tornabene by name deprived the County of the chance to investigate, since it had the necessary internal records to identify the "hospital staff" involved in the actions at issue.  Therefore, summary judgment is denied as to this argument.

### 2.      Merits of the Negligent Infliction of Emotional Distress Claim

Defendants next argue that the negligent infliction of emotional distress claim fails because Walters cannot establish that Tornabene or Cain had a legal duty to investigate his sobriety before ordering him to leave the hospital.

"Negligent infliction of emotional distress" is not an independent tort doctrine.  *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984 (1993).  Rather, "[n]egligent infliction of

emotional distress is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply." *Varnado v. Midland Funding LLC*, 43 F. Supp. 3d 985, 990 (N.D. Cal. 2014) (quotation and citation omitted).

California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others. Cal. Civ. Code § 1714(a); *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 768 (2011) (citing Cal. Civ. Code § 1714(a)); *T.H. v. Novartis Pharm. Corp.*, 4 Cal. 5th 145, 163 (2017) (same). "[I]n the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create [a duty] only where [it is] clearly supported by public policy." *Cabral*, 51 Cal. 4th at 771; *see also Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 397 (1992) (courts use the "concept of duty to limit generally the otherwise potentially infinite liability which would follow from every negligent act"); *Burns v. Neiman Marcus Group, Inc.*, 173 Cal. App. 4th 479, 487 (2009) ("California courts have explicitly rejected the concept of universal duty."). "[A]bsent a duty, the defendant's care, or lack of care, is irrelevant." *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 481 (1996). The question of duty is one of law. *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 618 (2018).

To determine whether a duty exists, courts consider the following factors, known as the "*Rowland* factors":

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise case with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968). "The most important of these considerations in establishing duty is foreseeability. As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" *Tarasoff v. Regents of Univ. of California*, 17 Cal. 3d 425, 434-35 (1976).

United States District Court
Northern District of California

When applying the *Rowland* factors, the question is not whether the specific facts support an exception to the general duty of reasonable care, but "whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017) (quoting *Cabral*, 51 Cal. 4th at 772). Unlike the other elements of negligence—breach, injury, and causation—which are necessarily fact-dependent, the "[a]nalysis of duty occurs at a higher level of generality." *Vasilenko*, 3 Cal. 5th at 1083 (citing *Cabral*, 51 Cal. 4th at 774).

Defendants frame the issue as whether Tornabene and Cain owed a duty to Walters to investigate his sobriety before ordering him to leave the hospital. Walters does not dispute this framing of the issue. However, the court rejects this framing because "on duty California law looks to the entire 'category of negligent conduct,' not to particular parties in a narrowly defined set of circumstances." *Cabral*, 51 Cal. 4th at 774. Here, Tornabene and Cain played different roles in the incident. As CCRMC's Medical Director, Tornabene's responsibilities included overseeing personnel, including temporary physicians. It is undisputed that Tornabene made the decision to remove Walters from the hospital. *See* Tornabene Decl. ¶¶ 2, 10, 11. In contrast, Cain states that he was asked to act as "security stand by" while the hospital relieved Walters. Cain Decl. ¶ 3; *see also* Sheriff's Report 2. He states, and Walters does not dispute, that his role was "to provide security for hospital management for a personnel matter," and that he "was not involved to investigate the report of a crime." Cain Decl. ¶ 4. There is no evidence that suggests that Cain made the decision to remove Walters from the hospital. Therefore, as to Tornabene, the issue is whether a hospital supervisor owes an employee a duty to investigate a claim of sobriety before removing the employee from the hospital due to her belief that he is physically or mentally impaired. As to Cain, the issue is whether a member of law enforcement acting as a hospital security guard owes an employee a duty to investigate a claim of sobriety before enforcing an order to leave the hospital due to an alleged physical or mental impairment. The court will first examine the issue of whether Tornabene owed Walters a duty and then turn to Cain.

### a.      Whether Tornabene Owed a Duty

The first three *Rowland* factors are all closely related to the question of foreseeability. *See*

United States District Court
Northern District of California

1    *Cabral*, 51 Cal. 4th at 774-81.  The California Supreme Court has explained that a court's task in

2    determining duty "is not to decide whether a *particular* plaintiff's injury was reasonably

3    foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally

4    whether the category of negligent conduct at issue is sufficiently likely to result in the kind of

5    harm experienced that liability may appropriately be imposed . . ."  *Id.* at 772 (quotation and

6    citation omitted).  The standard for foreseeability is one of "subjective reasonableness," which

7    asks if "injury to another 'is likely enough in the setting of modern life that a reasonably

8    thoughtful [person] would take account of it in guiding practical conduct.'"  *Sturgeon v. Curnutt*,

9    29 Cal. App. 4th 301, 307 (1994) (quoting *Bigbee v. Pacific Tel. & Tel. Co.*, 34 Cal. 3d 49, 57

10   (1983)).

11           As an initial matter, Walters does not clearly identify the injury he suffered as a result of

12   Tornabene's failure to investigate his sobriety, but he appears to contend that he experienced

13   shame and embarrassment from the accusation of being intoxicated and being removed from the

14   hospital.  *See* Opp'n 24.  Walters argues that this harm was foreseeable because Tornabene told

15   Cain that she was removing Walters because he was intoxicated, and that investigating Walters's

16   alleged intoxication "would have prevented the subsequent harm by removing the purported

17   reason for terminating and ejecting" him.  Opp'n 22.  However, this argument is too specific to the

18   facts of this case.  At this stage, the court's task is to determine "more generally" if the category of

19   negligent conduct "is sufficiently likely to result in the kind of harm experienced."  *See Cabral*, 51

20   Cal. 4th at 772.  Walters offers no argument or authority to suggest that in general, a supervisor's

21   failure to investigate an employee's sobriety before removing him or her from a hospital due to a

22   suspected impairment "is sufficiently likely to result in the kind of harm" that Walters

23   experienced.

24           Moreover, even considering the particular circumstances of this case, Walters's argument

25   on foreseeability relies on a connection between his purported intoxication and Tornabene's

26   refusal to investigate his claim of sobriety, a connection that is not supported by the record

27   evidence.  There is no admissible evidence that Tornabene accused Walters of being intoxicated or

28   that she decided to remove him from the hospital on that basis.  To the contrary, Tornabene states

that she did not accuse Walters of being under the influence, Tornabene Decl. ¶ 12, and Cain states that he does not remember who told him that "they suspected [that Walters] might be under the influence of drugs or alcohol." Cain Decl. ¶ 3. As noted, Walters did not depose any witnesses in this case and he offers no evidence to dispute Tornabene and Cain's statements. He also does not dispute Tornabene's statement that Walters "appeared to be either physically or mentally impaired such that [she] did not think he could safely care for patients," and that the reasons for his impairment were not important to her. Tornabene Decl. ¶¶ 11, 13. Accordingly, there is no evidence to suggest that Tornabene was on notice that Walters might be injured due to her failure to investigate his claim of sobriety in the absence of an accusation of intoxication. The court thus concludes that it is not reasonably foreseeable that a hospital administrator's decision to remove a hospital employee due to the belief that the employee was physically or mentally impaired by an unidentified cause without first investigating the employee's claim of sobriety would result in that employee's experiencing emotional distress.

While courts "characterize foreseeability as a consideration" under *Rowland*, "it is more than that. If the court concludes the injury was not foreseeable, there was no duty. There is no need to discuss the remaining considerations." *Sturgeon*, 29 Cal. App. 4th at 306 (citing *Ann M. v. Pacific Plaza Shopping Center*, 6 Cal. 4th 666, 679-80 (1993)). As the court finds that Walters's injury was not foreseeable, it concludes that Tornabene did not owe a duty to Walters. Summary judgment is therefore granted on the negligent infliction of emotional distress claim against Tornabene.

### b.      Whether Cain Owed a Duty

The court now turns to the question relevant to Cain, that is, whether a member of law enforcement acting as a hospital security guard owes an employee a duty to investigate a claim of sobriety before enforcing an order to leave the premises due to an alleged impairment.

In general, a police officer or member of law enforcement has no duty to protect a member of the public unless the officer has promised to do so and the individual relies on that promise. *Williams v. State of Cal.*, 34 Cal. 3d 18, 24 (1983). Where an officer undertakes action on behalf of an individual, he or she "is held to the same standard of care as a private person or

United States District Court
Northern District of California

1   organization." *Id*.  California courts have found no duty of care and have denied recovery "for

2   injuries caused by the failure of police personnel to respond to requests for assistance, the failure

3   to investigate properly, or the failure to investigate at all" because the "police had not induced

4   reliance on a promise, express or implied, that they would provide protection," such that there was

5   a "special relationship" between the plaintiff and police.  *Id*. at 25 (collecting cases).

6        Here, Walters's negligent infliction of emotional distress claim against Cain is premised on

7   Cain's failure to investigate Walters's claim that he was sober before enforcing Tornabene's order

8   to leave the hospital due to Walters's alleged impairment.  However, as explained above, an

9   officer does not owe a member of the public a duty of care with respect to an investigation unless

10  the officer takes action that creates a special relationship between the officer and the individual.

11  In the absence of an induced reliance, no duty attaches.  *See Williams*, 34 Cal. 3d at 24-25.  In this

12  case, Walters presents no evidence that Cain took any action that created a special relationship

13  between Cain and Walters.  Accordingly, Cain did not owe a duty to Walters to investigate his

14  claims of sobriety.  Summary judgment is therefore granted on Walters's negligent infliction of

15  emotional distress claim against Cain.

16        As Walters's claim against the County is based on respondeat superior for Cain and/or

17  Tornabene's acts, summary judgment is also granted on the negligent infliction of emotional

18  distress claim against the County.

19        **C.     Defamation**

20        Walters's final claim is for defamation against Tornabene and the County.  This claim is

21  based on the two reports about Walters that CCRMC submitted to the Medical Board of

22  California.  It is also based on Walters's allegation that Tornabene told hospital staff that Walters

23  "had refused to take a drug test, which was untrue."  5AC ¶¶ 79, 82, 83.

24        Defendants argue that the defamation claim fails because Walters did not exhaust his

25  administrative remedies as to that claim.

26        As discussed, "[t]he California Tort Claims Act requires anyone suing a public entity to

27  first file a claim with the entity that includes a 'general description' of the alleged injury 'so far as

28  it may be known at the time of presentation of the claim.'"  *K.T.*, 219 F. Supp. 3d at 981.  A claim

must contain, among other information, (1) "the date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" (2) "[a] general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim" and (3) "[t]he name or names of the public employee or employees causing the injury, damage, or loss, if known." Cal. Gov't Code § 910. "[A] claim need not contain the detail and specificity required of a pleading, but need only fairly describe what [the] entity is alleged to have done." *Stockett*, 34 Cal. 4th at 446 (citation and internal quotation marks omitted). However, "[i]f a plaintiff relies on more than one theory of recovery against the State, *each* cause of action must have been reflected in a timely claim." *Nelson v. State of California*, 139 Cal. App. 3d 72, 79 (1982) (emphasis added). Additionally, "the factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint." *Id*. Claims based on "an entirely different set of facts" are barred. *Stockett*, 34 Cal. 4th at 447.

Here, Walters satisfied the requirement of filing an administrative claim with the County on June 26, 2018. While the tort claim fairly reflects Walters's claims based on his physical interaction with Cain and negligence claims, it does not reflect a defamation claim. It does not mention Tornabene's actions with respect to the 805 reports or any statements about Walters's alleged refusal to take a drug test, and nothing in the claim suggests that Walters would or could bring a claim for defamation. Those claims are premised on different facts than those reflected in his tort claim and the defamation claim is based on a different "theory of recovery." *See Nelson*, 139 Cal. App. 3d at 79. Accordingly, Walters may not proceed with his defamation claim.

### D. Punitive Damages

Finally, Defendants move for summary judgment on Walters's claim for punitive damages. They argue that there is no evidence to support a finding that Cain's actions were malicious, oppressive, or in reckless disregard of Walters's rights. Mot. 23.

A jury may assess punitive damages under section 1983 when a defendant's conduct involves "reckless or callous indifference to the federally protected rights of others" without regard to actual intent or malice. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Under California law, punitive damages are available if a plaintiff proves "by clear and convincing evidence that the

defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Malice "includes the willful and conscious disregard of the rights or safety of others." Cal. Civ.Code § 3294(c)(1). Given that a jury will decide the reasonableness of the force used by Cain on Walters, the court finds that a triable issue exists as to Cain's state of mind during the incident at issue. *See Warren v. Marcus*, 78 F. Supp. 3d 1228, 1252 (N.D. Cal. 2015) (finding defendant was not entitled to summary judgment on punitive damages claim where there were questions of fact about the reasonableness of the force used by defendant officer).

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Summary judgment is granted as to Walters's section 1983 claim against the County; section 1983 claim against Cain for forcing Walters to depart the hospital in a taxi; third claim for negligent infliction of emotional distress against Tornabene, Cain, and the County; and defamation claim against Tornabene and the County.

**IT IS SO ORDERED.**

Dated: September 16, 2020



Donna M. Ryu
United States Magistrate Judge